# TRANSWESTERN CAREY WINSTON, LLC

## QUALIFIED REAL ESTATE AGENT AGREEMENT

THIS QUALIFIED REAL ESTATE AGENT AGREEMENT (the "Agreement") is made, effective as of March 1, 2019 by and between Transwestern Carey Winston, LLC, d/b/a Transwestern (the "Company"), and Mark J. Glagola (the "AGENT").

| | |
|---|---|
| Name: Mark J. Glagola<br>Address:<br><br>Telephone:<br>Real Estate License Number:<br>State: Maryland | **Transwestern Commercial Services, L.L.C.**<br><br>HEADQUARTERED IN HOUSTON, TX<br><br>BRANCH OFFICE: 7160 Columbia Gateway Drive, Suite 210, Columbia, MD, 21046 |

## RECITALS

A.  WHEREAS, the Company currently is engaged in business as a commercial real estate company.

B.  WHEREAS, the AGENT hereby represents that the AGENT is licensed by the appropriate regulatory authorities in the state of Maryland as a real estate salesperson or broker.

C.  WHEREAS, the Company and the AGENT now desire to enter into an agreement to provide for the establishment of a relationship between them for services to be performed for clients of the Company by the AGENT as a commissioned real estate contractor, which services and corresponding compensation are directly related to sales and leasing of real property, or other agreed upon output.

## COVENANTS

NOW, THEREFORE, in consideration of the Recitals, which are incorporated herein and made a substantive part of this Agreement, the mutual covenants, promises and agreements of the parties hereto, each to the other, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant, promise and agree as follows:

1.  **Engagement**.

    (a)  The Company hereby engages the AGENT, and the AGENT hereby accepts engagement by the Company, as a Qualified Real Estate Agent, to conduct business for the Company arising from the sale and leasing of commercial properties for and on behalf of Company clients. The AGENT does hereby represent and warrant, at all times during the term of this Agreement, that the AGENT is and shall be licensed by the real estate regulatory authorities of the jurisdictions in which the AGENT performs services under this Agreement; that the AGENT is,



EXHIBIT B

Deft 02156

and will perform services as, a licensed real estate contractor; and that the AGENT shall take all actions necessary to maintain each such license in good standing and effect.

**(b)** The AGENT's primary responsibilities are limited to activities that customarily are performed in connection with the brokerage of an interest in real property. Such services include, but are not limited to, the representation of buyers and/or sellers of real property; and landlords and/or tenants of real property for lease. Such services may also include by way of example, preparing or assisting in the preparation of market studies and/or providing opinions of value and the recruitment, training, or supervision of other real estate brokerage persons. Services performed as a real estate contractor do not include the management of property. The AGENT shall perform services as a real estate sales and leasing contractor, as provided in this Agreement, in a diligent and professional manner.

**(c)** During the term of this Agreement, AGENT shall attend brokerage meetings that Company conducts on a periodic basis, for which AGENT shall be provided reasonable advance notice. AGENT shall meet with AGENT's manager at such times as such manager requests, provided that AGENT is provided reasonable advance notice of such meetings. In the event that AGENT fails to meet brokerage goals to which AGENT and AGENT's manager mutually agree, AGENT shall cooperate and work with AGENT's manager toward improving AGENT's performance.

**(d)** AGENT shall have the title of Senior Managing Director with primary responsibilities on behalf of Company limited to activities that customarily are performed in connection with the brokerage of commercial and investment interest in real property.

2. **Independent Contractor Relationship.**

**(a)** The relationship of the AGENT to the Company established under this Agreement shall be that of an independent contractor and not as an employee for federal tax purposes. All or substantially all of AGENT's remuneration paid under this Agreement shall be based upon commissions, to which AGENT is entitled under the terms of this Agreement or under applicable law, for completed sales, leasing or like transactions, and not upon hours worked on any other basis. AGENT shall not be treated as an employee for any federal or state income or employment tax purposes, and the Company shall not withhold from AGENT's commissions or pay any amounts for income tax withholding, social security or other taxes that are imposed on employee compensation. AGENT agrees to be solely responsible for payment of all federal and state income taxes and all self-employment taxes on all commission income earned by AGENT hereunder. It is the parties' intention that AGENT satisfy the requirements of a Qualified Real Estate Agent, as such term is defined in Internal Revenue Code section 3508(b)(1). The AGENT's agreement to perform services under this Agreement as a Qualified Real Estate Agent for all purposes is an essential term of this Agreement.

**(b)** AGENT shall always represent him/herself to clients and prospective clients as a Company representative while performing services under this Agreement. Company will provide AGENT with business cards, letterhead stationery and related materials that identify AGENT's relationship with Company; and AGENT shall use such materials when communicating with clients and prospective clients, as appropriate.

Deft 02157

(c)     As an independent contractor, the mode, manner, method and means used by the AGENT to perform the terms and conditions of this Agreement shall be of the AGENT's sole selection, direction, and control.

(d)     Nothing contained in this Agreement shall be deemed to prohibit or preclude the AGENT's participation in or ownership of other businesses, ventures, enterprises, or other investments, so long as such activities do not materially and adversely inhibit the AGENT's ability to perform the AGENT 's obligations and responsibilities hereunder.   All such activities and ownership interests shall be disclosed to the Company in writing.

3.      **Term.**  Subject to the provisions for termination of this Agreement as set forth in Section 10 hereof, the term of this Agreement shall begin on March 1, 2019, and shall extend until February 28, 2021.

4.      **Compensation.**

(a)     The AGENT's compensation for services rendered hereunder shall be as set forth in Exhibit A, attached hereto and made a part of this Agreement.

(b)     The AGENT shall be entitled to receive his/her portion of commissions earned by the Company for services performed by the AGENT hereunder only after such Commissions have been received by the Company, and, unless otherwise agreed, shall be disbursed to the AGENT in accordance with the Company's routine commission-disbursement procedures as set forth in Exhibit A hereto.  The AGENT shall forward to Company any Commissions that the AGENT receives, and the Company shall hold all Commissions it receives in trust for the Company and the AGENT to be divided according to the terms of this Agreement.

(c)     Any commission disputes or controversies between the AGENT and any other producer of the Company shall be referred to, and resolved by, the Company pursuant to procedures the Company deems to be fair and appropriate. Its decision shall be final and binding upon the AGENT.

(d)     Notwithstanding any commission policy to the contrary, in the event Company terminates this Agreement for cause, the AGENT's portion of any commissions earned by the AGENT prior to such termination that Company receives after the termination of this Agreement shall be determined only at the minimum percentage "producer's share" then specified in said commission policy.

5.      **Contractor's Financial Responsibilities.**  The AGENT is solely responsible:

(a)     To pay all fees, dues, tuition costs and other expenses necessary to maintain all of the professional real estate licenses the AGENT is required to have by law.

(b)     To pay all out of pocket expenses incurred in pursuit and execution of the Company's business in accordance with Exhibit B.  These policies are subject to change from time to time at the Company's sole discretion.

(c)     To furnish, operate and pay for the AGENT's own automobile.

Deft 02158

**(d)** To carry and pay for automobile liability insurance with minimum limits sufficient to reasonably protect the AGENT and the Company from liability to third parties for personal injury and property damage, with the Company named as an additional insured (if possible) on all policies. If the AGENT, after reasonable efforts, is unable to have the Company named as an additional insured (or the equivalent) on the insurance policies without incurring an additional premium cost, the AGENT shall notify the Company and the Company shall have the option of paying such additional premium cost to obtain the coverage or waiving its requirement that it be named as an additional insured. The foregoing notification shall constitute full compliance with this Section 5(d) by the AGENT.

**(e)** To pay all costs associated with the AGENT's communication devices (mobile phone, tablet, etc.).

**(f)** To pay for any business-related travel and entertainment costs not approved by the Company.

**(g)** To pay certain pre-approved unreimbursed direct marketing costs and unreimbursed travel and entertainment expenses, unless treated as "off-the-top" costs that Company recovers from the AGENT's share of commissions. These amounts will be determined in accordance with Exhibit B.

**(h)** To allow the Company to deduct from any commissions to be disbursed to the AGENT any charges or expenses of the AGENT referred to in paragraphs (a) through (g) hereinabove, to the extent any of such charges or expenses are then due and have not been paid (or reimbursed to the Company) by the AGENT.

**6.   Other Expenses.** The Company shall not be liable for any expenses incurred by the AGENT without specific authority from the Company. On a case-by-case basis, the Company will determine the portion of attorney's fees (including for the legal services of the Company's in-house counsel), court costs, title fees, referral fees and other expenses that will be allocable to and paid by the AGENT that are incurred in the collection of commissions or suits relating to commissions. Suits relating to commissions shall be maintained or defended only in the name of the Company, and the AGENT agrees to cooperate with the Company in maintaining or defending any such suits both during and after the term of this Agreement. The portion of those fees charged to the AGENT shall not exceed the AGENT's share of the commission revenue sought to be collected.

**7.   Medical, Health and Liability Insurance.**

**(a)** The Company shall provide to the AGENT the opportunity to participate in the Company's standard healthcare, life and disability insurance coverage. It will be the AGENT's responsibility to adhere to the cost and payment terms set forth by the Company in participating in such AGENT provided healthcare, life and disability insurance coverage.

**(b)** The Company shall further provide the AGENT with coverage under the Company's professional errors and omissions liability insurance policy. Upon request, AGENT shall be provided with a certificate or other evidence of the then-existing insurance. The Company's professional liability insurance coverage is presently in an annual aggregate not to exceed $5,000,000

Deft 02159

with a $100,000 deductible amount. If this coverage is decreased, withdrawn, or modified so as to materially reduce AGENT's protection, the AGENT will be promptly notified of this in writing. In the event a professional liability claim is made based upon alleged acts or omissions of the AGENT and the Company is held liable for such claim or settles such claim, that portion of the defense costs or the settlement amount which are paid before the Company's professional liability insurance coverage becomes applicable to such claim will be shared on a case-by-case basis as determined by the Company.

**8.    Office Services.**  The Company shall provide the AGENT with access to the Company's office facilities, on a shared basis, including receptionist and secretarial services, duplicating, telephone, faxing, and other customary office services and amenities as more fully described in Exhibit B.

**9.    Treatment of Listings, Opportunities and Other Matters.**  All listings and other real estate opportunities or matters as to which the AGENT performs any services hereunder are at all times the sole and exclusive property of the Company and shall be treated as such by the AGENT. The AGENT shall treat all such listings, opportunities, and matters received from or through the Company as being confidential and proprietary to the Company, and the AGENT shall not reveal or disclose such information to any third parties without the express prior consent of the Company. The terms "listings", "opportunities" and "matters" as used herein and in Section 9 herein below, are not intended by the Company to in any way restrict or prevent the AGENT from using, in any other present or future business position or relationship, the AGENT's own business or personal contacts, general knowledge, expertise, rolodex files, information files or databases, or other non-proprietary items learned by, compiled by, or known to the AGENT as a result of work in the real estate business prior to entering into an independent contractor relationship with Company so long as such information does not include the Company's Confidential Information as defined in this Agreement. These Sections are applicable only to those listings, opportunities and matters which the Company, including the AGENT during the term of this Agreement, pursued or engaged in during the term of this Agreement. Notwithstanding the foregoing, such rolodex files, information files, databases and other files compiled by the AGENT during the term of this Agreement shall at all times be and remain the exclusive property of the Company. For purposes of this Agreement, the terms "listings", "opportunities" and "matters" shall include, but not be limited to, any of the following activities occurring within one year prior to the AGENT's termination: contact to discuss real estate needs; market surveys of available property; analysis of current lease; consulting or advisory services; requests for proposals; letters of intent; draft leases; market surveys of competitive properties; opinion of value; financial analysis and projections; valuation estimates; listing agreements; proposals for services; preparation of offering memorandums; property marketing plans.

**10.   Termination of Relationship.**

(a)    Any party may terminate this Agreement for any reason or no reason by giving the other party at least thirty (30) days prior written notice of termination. Notwithstanding such notice period, the Company, at its option, may require the AGENT to remove himself/herself and his/her property from the Company's premises at any time prior to the expiration thereof;

5

Deft 02160

**(b)** The Company may terminate this Agreement immediately and without 30 days' prior notice:

**(i)** upon revocation or cancellation of the AGENT's licensure, or right to be a licensed real estate contractor, in any jurisdiction; or

**(ii)** upon the placing or imposing of any restriction or limitation by any governmental authority having jurisdiction over the AGENT, such that the AGENT can no longer lawfully engage in the professional services called for herein; or

**(iii)** If the AGENT materially breaches the Agreement and the AGENT fails to cure such breach or violation to the reasonable satisfaction of the Company within five (5) days after the AGENT receives written notice from the Company informing the AGENT of the existence of such breach or violation. For purposes of this Agreement, a "material breach" by the AGENT shall occur if the AGENT: (A) engages in conduct that is likely to cause substantial injury to the property, operations or reputation of the Company; or (B) engages in conduct that is unprofessional, unethical, illegal or fraudulent; or (C) violates local, state, federal or international law, or the law of any country in which the AGENT is engaged in services for the Company pursuant to this Agreement; or (D) defaults on or breaches any other material obligations owed to Company under this Agreement.

**(c)** The AGENT may terminate this Agreement immediately and without 30 days' prior notice if the Company materially breaches the Agreement and the Company fails to cure such breach or violation to the reasonable satisfaction of the AGENT within five (5) days after the Company receives written notice from the AGENT informing the Company of the existence of such breach or violation. For purposes of this Agreement, a "material breach" by the Company shall occur if the Company: (A) refuses to pay the AGENT fees expressly agreed upon in this Agreement, or (B) the Company defaults on or breaches any other material obligation owed to the AGENT under this Agreement.

In the event the AGENT is an individual, the death of the AGENT will constitute an event of termination without cause of this Agreement immediately. In the event the AGENT is a corporation or a limited liability company ("LLC"), the death of the person owning the controlling interest of such corporation or LLC or the transfer of controlling interest of the corporation or LLC will terminate this Agreement immediately. In such event, the entitlement to any commissions shall be governed by the terms of this Agreement in the same manner as any other termination without cause.

**11. Effect of Termination**. Upon termination or expiration of this Agreement for any reason:

**(a)** The AGENT shall immediately cease working on any then existing listings, opportunities or matters of the Company without specific express approval from the Company. Since it is generally in the best interests of both the Company and the AGENT to continue to have the AGENT involved in opportunities or matters on which the AGENT is actively performing services as a real estate contractor at the time the termination of this Agreement occurs, the Company, in its sole discretion, may make (and the AGENT hereby agrees to make) reasonable

Deft 02161

and good faith efforts to enter into a Termination Agreement (as referred to in Section 11(d) below) which fairly preserves and protects the rights of both the Company and the AGENT with regard to such opportunities and matters. Within ten (10) days of any termination of this Agreement, AGENT shall provide a pipeline report listing the transactions which AGENT contends may result in a commission becoming owed to AGENT under the terms of this Agreement following such termination. Within ten (10) days of receiving AGENT's pipeline report, Company shall provide a written Termination Agreement to AGENT.

**(b)** The AGENT shall immediately cease making any representation that the AGENT is in any way associated with the Company without specific express approval from the Company.

**(c)** The AGENT shall immediately return all materials, technical and administrative documentation, all of the Company's Confidential Information (as defined below) and any other objects, documents, or other property in any form belonging to the Company.

**(d)** The AGENT shall no longer be entitled to receive any other or further benefits herein set forth, except for disbursement of commissions either: (A) arising out of a non-contingent fully-executed lease or a closed contract of sale procured by the AGENT within a thirty (30) day period following the termination date; or (B) arising out of any Termination Agreement entered into between the Company and the AGENT. Unless a different time period is stated in a Termination Agreement entered into between the Company and the AGENT, all commission payments due to the AGENT under this section shall be disbursed in accordance with Section 4 of this Agreement. Notwithstanding any commission policy to the contrary, the AGENT's portion of any commissions earned by the AGENT that Company receives after the termination of this Agreement by Company for cause shall be determined only at the minimum percentage "producer's share" then specified in said commission policy set forth in Exhibit A, as amended. Notwithstanding the foregoing terms and conditions, if the Company has provided a loan to the AGENT or if the Company is owed reimbursement of expenses from the AGENT, then the AGENT shall, upon termination, immediately pay to the Company any such amounts which the Company has not then recouped from the AGENT. In the event AGENT fails to repay any such amounts, such failure shall constitute a breach of this Agreement and Company shall be entitled to offset any unpaid amounts against any commissions owed, or that may become owed to AGENT by Company.

**12.  Confidentiality.**

**(a)** The AGENT acknowledges and agrees that the Company has invested significant time and money in developing its Confidential Information as defined in paragraph 12(b) below and the unauthorized disclosure or use of such Confidential Information may cause injury, loss of profits and loss of goodwill to the Company. Provided that the AGENT agrees to the terms of this Agreement, the Company will afford the AGENT access to the Company's Confidential Information to the extent that the Company deems the AGENT's access to Confidential Information necessary for the performance of the AGENT's obligations under this Agreement. Absent the AGENT's relationship with the Company pursuant to this Agreement, the AGENT would not have had access to the Company's Confidential Information. Furthermore, unless the AGENT agrees to the terms of this Agreement, the Company will not permit the AGENT to access the Company's Confidential Information.

Deft 02162

**(b)** For purposes of this Agreement, "Confidential Information" means and includes the Company's trade secrets, as defined by applicable law, and/or any other information, in whatever form, tangible or intangible, that is not generally known to the public and (i) is generated, collected by or utilized in the operations of the Company's business and relates to the actual or anticipated business, research or development of the Company; or (ii) relates to or results from any task assigned to the AGENT by the Company or work performed by the AGENT for or on behalf of the Company.

**(c)** Without limiting the foregoing definition, Confidential Information includes, but is not limited to, all customer, supplier and vendor lists, budget information, contents of any database, contracts, product recipes, designs, technical know-how, pricing and cost information, performance standards, business plans, proprietary data, projections, market research, strategic plans, marketing information, financial information (including financial statements), sales information, training manuals, employee lists and compensation of employees, and all other competitively sensitive information with respect to the Company, whether or not it is in tangible form, and including without limitation any of the foregoing contained or described on paper or in computer software or other storage devices, as the same may exist from time to time.

**(d)** Throughout the Term of this Agreement or at any time thereafter, unless otherwise specifically authorized in writing by the Company, the AGENT agrees: (i) to hold Confidential Information in the strictest confidence; (ii) not to, directly or indirectly, disclose, divulge or reveal any Confidential Information to any person or entity other than as authorized by the Company; (iii) to use such Confidential Information only to perform the obligations contained in this Agreement,; and (iv) to take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company in the Confidential Information. The AGENT also agrees to immediately notify the Company of any unauthorized disclosure or use of any Confidential Information of which the AGENT becomes aware.

**(e)** Confidential Information shall not include information that the AGENT can demonstrate: (i) is generally available to the public without breach of this Agreement, (ii) was known by the AGENT at of the time of disclosure free of any obligation to keep such information confidential as evidenced by documentation in the AGENT's possession, (iii) is independently developed by the AGENT without access to the Confidential Information, and/or (iv) is rightfully obtained from a third party lawfully in possession of the Confidential Information and not under a confidentiality obligation.

**(f)** The AGENT acknowledges that the Company has received, and in the future will receive from third parties their confidential information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The AGENT agrees to preserve and protect the confidentiality of such third parties' confidential information to the same extent, and on the same basis, as the Company's Confidential Information.

**(g)** Nothing in this Agreement shall prevent the AGENT from: (i) reporting, without prior approval from the Company, possible violations of federal securities laws or regulations to any governmental agency or entity, including but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and any Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation; (ii)

Deft 02163

filing a charge of discrimination with the Equal Employment Opportunity Commissions; (iii) cooperating with the Equal Employment Opportunity Commission in an investigation of alleged discrimination; (iv) revealing evidence of criminal wrongdoing to law enforcement; (v) testifying in any cause of action when required to do so by law, or (vi) divulging Confidential Information pursuant to an order of court or agency of competent jurisdiction. However, with respect to paragraphs (12)(g) (v) and (vi) only, the AGENT shall promptly inform the Company of any such situations and shall take such reasonable steps to prevent disclosure Confidential Information until the Company has been informed of such requested disclosure and the Company has had an opportunity to respond to the court or agency.

13.   **Defend Trade Secrets Act**. Pursuant to Section 7 of the Defend Trade Secrets Act of 2016, the AGENT is advised that nothing in this Agreement interferes with the AGENT's rights outlined in the Defend Trade Secrets Act and the AGENT shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (a) is made: (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Also pursuant to Section 7 of the Defend Trade Secrets Act of 2016, the AGENT is advised that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret information in the court proceedings relating to the suspected violation of law, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

14.   **Employee/Contractor/Broker Non-Solicitation**. The AGENT agrees that during the term of this Agreement and for a period of six (6) months after the termination or expiration of this Agreement, for any reason, the AGENT shall not, without the prior written approval of the Company, directly or indirectly, solicit for employment or affiliation, or employ or affiliate, any person who was an employee, contractor or broker with the Company at any time within a one (1) year period prior to the effective date of the termination of this Agreement.

15.   **Client Non-Solicitation**. The AGENT agrees that during the term of this Agreement and for a period of twelve (12) months after the termination or expiration of this Agreement, for any reason, the AGENT shall not, without the prior written approval of the Company, directly or indirectly, solicit any business from any person or entity which was a client of the Company within a one (1) year period prior to the termination or expiration of this Agreement and for whom the AGENT performed services, or about whom the AGENT learned Confidential Information, at any time during the Term of this Agreement.

16.   **Remedies**. The AGENT acknowledges that any breach by the AGENT of the covenants set forth herein would result in irreparable harm to the Company for which monetary damages alone would be an insufficient remedy. Thus, although nothing in this Section will prohibit Company from pursuing any remedies available to it against any party under applicable law (which shall be cumulative with those remedies set forth herein), the AGENT specifically agree that, in the event of any threatened or actual breach of this Agreement by the AGENT, the Company shall be entitled to a temporary, preliminary and permanent injunction and other

Deft 02164

equitable relief including, without limitation, an equitable accounting of earnings, profits, and other benefits, from a court of competent jurisdiction.

**17.    Extension of Term of Covenants Following Violation.** The period during which the prohibitions of Sections 14 and 15 are in effect shall be extended by any period or periods during which the AGENT is in violation of Sections 14 and/or 15.

**18.    Reasonableness of Restrictions.** The AGENT has carefully considered the nature and extent of the restrictions upon the AGENT and the rights and remedies conferred upon the Company hereunder and acknowledge and agree that they are reasonable in scope, time, and territory, are designed to eliminate competition that would otherwise be unfair, do not interfere with the AGENT's exercise of the AGENT's inherent skill and experience, are reasonably required to protect the legitimate interests of the Company, and do not confer a benefit upon the Company disproportionate to the detriment to the AGENT. The AGENT represents that he/she has had the opportunity to discuss this Agreement with any legal advisor of the AGENT's choosing and that the AGENT understands these provisions and has entered into this Agreement freely and voluntarily.

**19.    Indemnification.**

**(a)**    Except as set forth in subpart (d) below, the Company shall indemnify, defend and hold harmless the AGENT from and against any and all third-party claims, suits, judgments, or other liability or obligation where such liability or obligation arises out of the AGENT's rendering or failure to render real estate services authorized by and performed pursuant to this Agreement, provided, however, that the extent such indemnity and hold harmless shall not extend to claims, suits, judgments or other liabilities or obligations to the extent resulting from AGENT's gross negligence or willful misconduct and shall in no event exceed the coverage provided by the Company's professional errors and omissions liability insurance policy and shall be subject to the retention and limits of liability set forth in the Declaration of said insurance policy.

**(b)**    It is the responsibility and obligation of the AGENT to pay all taxes, (including, but not limited to, all Federal self-employment taxes) and interest and penalties thereon (if any), which may arise or become due by reason of the AGENT's performance of services, and/or receipt of commissions and any other remuneration, under this Agreement, whether the same be assessed against the Company or the AGENT. In the event the AGENT fails to fulfill his obligation as set forth in the preceding sentence, then the AGENT shall indemnify, defend and hold harmless the Company from any and all expenses, costs, payments, taxes, interest, penalties which are attributable to or related to the AGENT's commission income and which may be imposed on an "employer", as that term is defined in the Internal Revenue Code.

**(c)**    The AGENT and the Company intend that this Agreement, including all of its terms and conditions, satisfy the standards of Section 3508 of the Internal Revenue Code. Once a year during the term of this Agreement the AGENT and the Company will review their status under this Agreement and take whatever actions may be necessary to continue to have this Agreement, including all of its terms and conditions, satisfy the standards of Section 3508.

Deft 02165

**(d)** The AGENT shall indemnify, defend and hold harmless the Company from and against any and all claims, suits, costs, expenses (including reasonable attorney's fees), judgments, or other liability or obligation, if and to the extent that the same arise out of the AGENT's gross negligence or willful misconduct.

20. **Entire Agreement.** This Agreement (together with any Addendum or Exhibits attached) contains the entire understanding between the parties hereto and supersedes all other oral and written agreements or understandings between them.

21. **Blue Pencil.** If, at the time of enforcement of this Agreement, a court holds that the duration, geographical area or scope of activity restrictions stated herein are unreasonable under circumstances then existing or impose a greater restraint than is necessary to protect the goodwill and other business interests of the Company, the AGENT agrees that the maximum duration, scope or area reasonable under such circumstances will be substituted for the stated duration, scope or area and that the court will be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law, in all cases giving effect to the intent of the parties that the restrictions contained herein be given effect to the broadest extent possible.

22. **Severability.** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under applicable law, and incapable of being modified, such invalidity, illegality or unenforceability will not affect any other provision, but this Agreement will be reformed, construed and enforced as if such invalid, illegal or unenforceable provision had never been contained herein.

23. **Amendments.** Except as set forth in paragraphs 21 and 22 above, this Agreement shall not be amended, modified or supplemented except by a written instrument signed by each of the parties hereto.

24. **Assignment.** The rights herein may be assigned by the Company and shall bind and inure to the benefit of the Company's successors, assigns, heirs and representatives. If the Company makes any assignment of the rights herein, the AGENT agrees that this Agreement shall remain binding upon the AGENT in any event.

25. **Survival.** The AGENT's obligations set forth in Sections 12, 14 and 15 of this Agreement shall survive the termination or expiration of this Agreement.

26. **Notices.** All notices and communications hereunder shall be in writing and shall be deemed given by a party when personally delivered, or sent postage prepaid by first class mail, to the other party, using the respective addresses set forth on page 1 hereof. Either party hereto may change its address, by providing written notice thereof to the other party.

27. **Applicable Law.** This Agreement shall be governed by, interpreted, and construed in accordance with the laws of the state of Maryland without regard to Maryland's principles of conflicts of law.

Deft 02166

28. **Exclusive Jurisdiction**. Any and all lawsuits, legal actions or proceedings against either party arising out of this Agreement will be brought in state or federal court of competent jurisdiction, and all parties shall submit to and accept the exclusive jurisdiction of such court for the purpose of such suit, legal action or proceeding. Each party irrevocably waives any objection it may have now or any time in the future to this choice of venue and further waives any claim that any suit, legal action or proceeding brought in any such court has been brought in an inappropriate forum. The AGENT and the Company shall stipulate in any proceeding that this Agreement is to be considered for all purposes to have been executed and delivered within the geographic boundaries of the State of Maryland.

29. **No Waiver**. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

30. **Paragraph Headings**. The paragraph headings contained herein are for purposes of reference and convenience only and shall not be used or referred to in any way in construing the meaning of this Agreement, or any paragraph hereof.

31. **OFAC Representations, Warranties, and Indemnification**. The AGENT represents and warrants that (i) the AGENT is not a person with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or under any other law, rule, order, or regulation that is enforced or administered by OFAC (such persons and entities each being a "Prohibited Person"); (ii) the AGENT is not acting directly or indirectly, for or on behalf of any Prohibited Person; (iii) the AGENT is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any Prohibited Person; and (iv) the AGENT will not contract with or otherwise engage in any dealings or transactions or be otherwise associated with any Prohibited Person.

32. **Contractor's Obligations to Prior Firms**.

(a) While affiliated with the Company, and during all discussions and activities leading up to such affiliation, the AGENT is solely responsible for observing and adhering to all legal obligations the AGENT has with any prior firm, including without limitation any post-termination obligations the AGENT has with respect to any prior firm's proprietary or trade secret information, its employees, salespersons and brokers, and its clients and customers. The AGENT hereby represents and warrants to the Company that the AGENT has not taken with him/her from any prior firm, and will not bring to the Company, any documents or other tangible things, containing information that constitutes prior firm's protectable proprietary information or trade secrets. Moreover, during the term of this Agreement, the AGENT hereby affirms and agrees that the AGENT will not use or disclose to the Company any information that the AGENT believes constitutes any prior firm's protectable proprietary information or trade secrets.

Deft 02167

**(b)** If during the AGENT's affiliation with the Company, the AGENT is placed in a position or asked to do something that the AGENT believes might cause the AGENT to violate some continuing obligation, if any, that the AGENT owes to any prior firm and that the AGENT believes is enforceable under the law, the AGENT will seek counsel and discuss the issue with his/her counsel. If the AGENT's counsel concludes that the AGENT may not perform the requested action, either the AGENT or his/her counsel will so notify the Company. The AGENT's failure to comply with the foregoing representations and requirements will be considered to fall outside the scope of the AGENT's association with the Company and contrary to the discharge of the AGENT's duties to the Company.

**(c)** The AGENT agrees to defend, indemnify and hold harmless the Company from any and all damage, cost, expense and/or loss (including reasonable attorney's fees) incurred by the Company as a result of the AGENT's breach of this Section 32. This Agreement is subject to the condition precedents that the AGENT has the right under his/her various agreements with any prior firm to terminate his/her relationship with any such prior firm and fulfill the terms of this Agreement.

**33.    Attorney's Fees.** In the event any legal proceeding is initiated by any party against any other party to enforce, interpret or otherwise obtain relief in connection with this Agreement (the "Proceeding"), the judge or tribunal in such Proceeding shall, upon request, declare a "Prevailing Party" in the Proceeding, and the Prevailing Party shall be entitled to recover from the other party all reasonable costs and expenses, including actual attorneys' fees and experts' fees, relating to or arising out of such Proceeding.

IN WITNESS WHEREOF, the parties hereto, intending to be thereby legally bound, have executed this Agreement as of the date first hereinabove set forth.

**TRANSWESTERN CAREY WINSTON, LLC**

By: _[signature]_

Printed Name: Keith A. Foery

Title: Executive Managing Director

Date: 3/20/19

**AGENT:**

By: _[signature]_

Printed Name: Mark J. Glagola

Title: Senior Managing Director

Date: 3/11/19

Deft 02168

Deft 02169

## EXHIBIT A
## COMMISSION STRUCTURE

| Calendar Year<br>Gross Commissions | Base<br>Participation |
|---|---|
| $0 to $300,000 | 50.0% |
| $300,001 to $450,000 | 55.0% |
| $450,001 to $750,000 | 60.0% |
| $750,001 to $1,000,000 | 65.0% |
| $1,000,000+ | 70.0% |

(A)   The Company shall pay AGENT commissions based on AGENT's production of brokerage revenues as set forth, and to be calculated as outlined, herein.

   (i)   Subject to the Company's sole discretion and final, written approval, AGENT and any other producers for a particular transaction, if any, shall agree on how to allocate between or among themselves the brokerage revenues anticipated to be received by the Company for a particular transaction. Brokerage revenues shall be allocated on a percentage basis so that all producers' allocation percentages collectively equal 100%. AGENT's allocation percentage of the Company's brokerage revenue for a particular transaction shall be referred to herein as "AGENT's Allocation Percentage." The sharing / allocation of fees between producers will be the decision of the producers involved in the transaction. The Company will resolve all disputes. The final decision by the Regional President will be binding on all producers. The Company shall have the right and sole discretion to determine (a) whether AGENT shall be a producer for any particular transaction, and (b) AGENT's Allocation Percentage for a particular transaction.

   (ii)   AGENT's Allocation Percentage for a particular transaction shall be multiplied by the gross brokerage revenues actually received by the Company for that particular transaction, resulting in "AGENT's Allocation Revenue" for that particular transaction.

   (iii)   The Company shall pay AGENT commissions in an amount calculated by multiplying AGENT's Allocation Revenue (progressively applied to AGENT's Revenue Scale/Gross Fee Production Breakpoints, and recorded in the Company's financials, on a calendar year basis starting January 1 and ending December 31) by the percentages reflected in the Revenue Scale/Gross Fee Production Breakpoints above.

(B)   Fees for a transaction will be added to AGENT'S commission split scale upon unrestricted receipt by Company of the gross commission generated by AGENT for that transaction.

(C)   Payment to AGENT of AGENT's share of commissions will be on an as-collected basis. All payments will be made to AGENT in accordance with the Company's routine payment procedures.

(D)   The above Commission Structure shall apply to all transactions closed after the effective date of the Agreement.

Case 1:23-cv-00881-JMC    Document 4-2    Filed 04/27/23    Page 16 of 18

(E)  Fees added to the AGENT's commission scale shall exclude Development Fees that are paid pursuant to a Development Fee Split Letter and other fees that are not typically applied to commission scales in accordance with standard Company policies and practices.

(F)  Notwithstanding any commission policy to the contrary, the AGENT's portion of any commissions earned by the AGENT that Company receives after the termination of this Agreement by Company for cause shall be determined only at the minimum percentage "producer's share" which shall mean the lowest "Base Participation" percentage tier set forth above in this Exhibit A.

References herein to AGENT shall also mean and include, as applicable, AGENT's assignee(s) (pursuant to assignments permitted in accordance with the Agreement).

Deft 02171

# EXHIBIT B
## Mid-Atlantic Expense Reimbursement Policy

**Business Pursuit Expenses**

Significant expenses such as large dinners or travel need to be pre-approved. Approved business expenses for successful pursuits will be accumulated and deducted "off the top" of transaction fees or revenue generated. Unsuccessful business pursuit costs will be absorbed by Transwestern. Although airfare and hotel costs continue to rise we expect you to research the best airfare and most reasonable hotel rates and on occasion sacrifice convenience for savings. Examples of what is expected are items such as 14-day advance purchase on air fare, no Business Select or business class tickets should be purchased. Transwestern's policy on this and discretion left to you are far more favorable than our competitors, and if we want to keep this policy we will need to control cost increases. Notwithstanding the above, Transwestern (the company) recognizes that the agent, Mark Glagola has a unique position in business development. The company will reasonably pay all Business Pursuit Expenses the agent creates as submitted in appropriate company form and format. Expenses may include travel, lodging, meals, entertainment, communications, parking, taxis, ride sharing, and client gifts.

**Client Entertainment / Dinner**

All client entertainment dinners in excess of $100 per person in the aggregate will be reimbursed at 50%, or if pre-approved will be taken "off the top" of deals. In addition, a prudent rule is to make dinner and entertainment selections that you would be comfortable paying the entire cost.

**Charitable Contributions, Client Gifts or Sponsorships**

All charitable contributions, sponsorships, tables, etc. that are purchased at the behest of clients or client gifts will be severely limited and will require written prior approval. Approved items shall be reimbursed by the firm to a maximum of 50% of the amount. Only those events that "specifically" raise the awareness of Transwestern in Mid-Atlantic leadership's determination will be approved. Any pre-approved client gifts will be reimbursed at 50%.

**Industry-Related Organizational Dues, Events and Licensing**

Licensing requirements, organizational membership dues that have been pre-approved, and attendance at pre-approved industry events shall be reimbursed by the firm at 50%.

**Employee Lunches and Entertainment**

We have continued to see the expensing of "team lunches" or impromptu cocktail parties in which the only attendees are employees of Transwestern. These lunches and other employee entertainment that do not include clients will not be reimbursed except in unusual circumstances when pre-approved by Mid-Atlantic leadership. This is consistent with current Transwestern policy.

**Other Expenses**

Deft 02172

While we realize client entertainment is a significant cost of doing business, our profit margins do not allow these expenses to reach the levels they have in the last 2 years. If you're in doubt as to what will and will not be reimbursed, just ask your manager.

**Review of Expenses**

All expense reports will be reviewed for conformity with policy and approved by your manager.

**Timeliness of Expense Reimbursement Submittals**

It is acceptable and preferred to aggregate smaller expenses over time and submit them when the amount becomes more significant; however, it is not acceptable to submit large amounts of expenses once or twice a year, as this among other reasons, can create budget and cash-flow challenges for the region. Any expenses more than 3 months past the date incurred will not be approved for reimbursements.

**Shared Business Expenses**

Pre-approved, unreimbursed direct property / building marketing expenses / building signs will be treated as "off-the-top" costs and will reduce the gross commissions allocated to producer's revenue scale, or 50% of the cost will be allocated to each member of the team proportionate to their splits. Producers are encouraged to obtain marketing budgets on all projects leased and to have all project marketing and selling costs paid by owners.

Deft 02173