## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **GERALD TRAINOR,** | * | |
| *Plaintiff/Counter-Defendant* | * | |
| v. | * | |
| | | Civil Case No: 1:23-cv-00881-JMC |
| **MARK GLAGOLA, et al.,** | * | |
| *Defendants/Counter-Plaintiff* | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **MARK GLAGOLA,** | * |
| *Cross-Plaintiff* | * |
| v. | * |
| **TRANSWESTERN DEVELOPMENT COMPANY, LLC** | * |
| | * |
| *Cross-Defendant* | * |

\* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **MARK GLAGOLA,** | * |
| *Third-Party Plaintiff* | * |
| v. | * |
| **TDC LOGISTICS COMPANY, LLC f/k/a RIDGE DEVELOPMENT COMPANY, LLC., et al.,** | * |
| | * |
| *Third-Party Defendants/Counterclaimants* | * |

\* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION AND ORDER</u>

This matter arises from a dispute over the proper allocation of an over $1.8 million dollar judgment awarded by this Court in July 2022. The following motions are currently pending: (1) Plaintiff/Counter-Defendant Gerald Trainor's ("Trainor") Motion for Leave to Amend the Complaint (ECF No. 57); (2) Trainor's Motion for Summary Judgment (ECF No. 58); (3)

Defendant/Cross-Defendant Transwestern Development Company, LLC ("TDC") and Third-Party Defendant TDC Logistics Company, LLC's ("TDC Logistics") Motion for Summary Judgment (ECF No. 59); (4) Third-Party Defendant/Counterclaimant Transwestern Carey Winston, LLC's ("TCW") Motion for Summary Judgment (ECF No. 60); and (5) Defendant/Counter-Plaintiff/Cross-Plaintiff/Third-Party Plaintiff/Cross-Defendant Mark Glagola's ("Glagola") Cross-Motion for Summary Judgment (ECF No. 67). The motions are fully briefed, (ECF Nos. 61, 66, 68, 71, 72, 73, and 76), and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth herein, TDC and TDC Logistics' Motion for Summary Judgment (ECF No. 59) shall be GRANTED. The remaining Motions for Summary Judgment, (ECF Nos. 58, 60, and 67), and Trainor's Motion for Leave to Amend the Complaint, (ECF No. 57), shall be DENIED.

## I.    **BACKGROUND**

### a.    **Factual Background**

Unless specifically noted, the following facts are not in dispute. The Court will begin by briefly describing the parties and their relationships to one another. Trainor and Glagola worked as commercial real estate brokers for TCW (under independent contractor agreements) during most of the relevant time frame in this matter, until Glagola's departure from TCW in September 2020. TCW is the wholly owned subsidiary of Transwestern Commercial Services, LLC, who is not a party to this litigation. (Glagola's Mot. Summ. J. at 25-26, ECF No. 67).[1] TCW and the TDC companies (TDC Logistics and TDC) share the same legal counsel, CEO, CFO, and COO, and the

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document is not electronically stamped, the citation is instead to the number at the bottom of the page.

same individual has decision-making authority on legal matters for all three companies. *Id.* at 26. TDC Logistics is a wholly owned subsidiary of TDC. *Id.*[2]

On July 25, 2022, this Court granted summary judgment to Glagola in a separate breach of contract action he brought against TDC and TDC Logistics. *See generally Glagola v. Transwestern Dev. Co.*, No. 1:21-01230-JMC, 2022 WL 2916169 (D. Md. July 26, 2022). The undersigned held that TDC owed Glagola more than $1.3 million, in addition to interest and a future payment based on a commercial real estate project not completed at that time. *Id.* at *6-7. The Fourth Circuit affirmed this Court's opinion on July 26, 2023, and per a Notice of Satisfaction filed in that matter, the TDC companies satisfied the judgment in full on August 16, 2023, paying Glagola a total of $1,837,821.73. *Glagola v. Transwestern Dev. Co.*, No. 22-1890, 2023 WL 4759125, at *1 (4th Cir. July 26, 2023); Glagola's Notice of Satisfaction of J., Glagola v. Transwestern Dev. Co., No. 21-1230 (D. Md. Aug. 16, 2023), ECF No. 58. As will be explained, Trainor and TCW assert that they each have an interest in the judgment, while Glagola maintains that he is entitled to the full sum.

### i. Glagola & Trainor's Independent Contractor Agreements with TCW

Glagola began performing real estate broker services for TCW[3] as an independent contractor in 2007. (Glagola's Mot. Summ. J. at 3, ECF No. 67). He worked from TCW's Maryland office, brokering the sale and leasing of commercial properties throughout the country. *Id.* Glagola initially worked pursuant to an Independent Contractor Agreement dated August 16, 2007 ("2007 Glagola IC Agreement") and later pursuant to a Qualified Real Estate Agent

---

[2] TDC, TDC Logistics, and TCW indicate these statements are undisputed for the purposes of the pending motions only. (ECF No. 72-1 at 9; ECF No. 73-1 at 8-9). Trainor states he lacks sufficient personal knowledge to respond. (ECF No. 71-1 at 13).

[3] Trainor refers to Transwestern Carey Winston, LLC as "TCS" rather than "TCW" in his Motion for Summary Judgment.

Agreement dated March 1, 2019 ("2019 Glagola IC Agreement"). (Glagola's Mot. Summ. J. Ex. 3, ECF No. 68). The 2019 Glagola IC Agreement provided that Glagola would be entitled to receive his "portion of commissions earned by [TCW] for services performed by [Glagola] only after such commissions [had] been received by [TCW]" and that his commissions were tied to his "production of brokerage revenues" on behalf of TCW. *Id.* The agreement permitted participation in outside investments, businesses and other ventures, subject to certain conditions:

> (d) Nothing contained in this Agreement shall be deemed to prohibit or preclude the AGENT's participation in or ownership of other businesses, ventures, enterprises, or other investments, so long as such activities do not materially and adversely inhibit the AGENT's ability to perform the AGENT's obligations and responsibilities hereunder. All such activities and ownership interests shall be disclosed to the Company in writing.

*Id.* at 4. The 2019 Glagola IC Agreement further provided that "[a]ny commission disputes or controversies between the AGENT and any other producer of the Company shall be referred to, and resolved by, the Company pursuant to procedures the Company deems to be fair and appropriate" and that such decision "shall be final and binding upon the AGENT." *Id.*

Trainor has been a commercial real estate agent for TCW since 1999, also as an independent contractor. (Trainor's Mot. Summ. J. Ex. 1, ECF No. 58-2 at 1). Trainor worked pursuant to an Independent Contractor Agreement ("Trainor 2001 IC Agreement") which became effective on January 1, 2001. (Glagola's Mot. Summ. J. Ex. 4, ECF No. 68). Trainor was to be compensated based upon TCW's "commission schedules and policies published and in effect from time to time." *Id.* The agreement further specified that commissions were "payable only after they have been received by [TCW]" and would be paid "not later than the third Friday of the month following the month" when the commissions were received by TCW, unless agreed otherwise. *Id.* A 2001 addendum to the Trainor 2001 IC Agreement set forth details on Trainor's commission

rates, and additionally provided that he would be "eligible to receive TIC acquisition fees and to participate in TIC GP Equity Participation programs, as offered from time to time, for acquisitions that [Trainor] is responsible for sourcing[.]" *Id.* The Trainor 2001 IC Agreement featured several provisions mirroring the terms of the 2019 Glagola IC Agreement, including that commission disputes with other contractors would be resolved by TCW's Operations Committee, and that Trainor could participate in "other businesses, ventures, enterprises, or other investments" provided that they did not interfere with his obligations to TCW and he disclosed such activities to the company. *Id.*

Trainor entered into periodic agreements with TCW which supplemented his 2001 IC Agreement, and on February 29, 2016, executed a "First Addendum to March 21, 2013 Letter Agreement (First Addendum)" which extended his contract through December 31, 2020 and "outlined numerous monetary benefits for Trainor that were separate and apart from his commission compensation." (Glagola's Mot. Summ. J. at 7, ECF No. 67). Trainor entered into two subsequent agreements with TCW, the first in 2016 (referred to as the "Third Agreement") and the second in 2018, which was titled the "Fourth Amendment to Independent Contractor Agreement ("2018 Fourth Amendment"). *Id.* at 7-8. The 2018 Fourth Amendment amended and restated the Trainor 2001 IC Agreement. *Id.* at 8.

Regarding commissions, both Trainor and Glagola "were paid according to their agreed upon commission structure with TCW." *Id.* at 9. By way of example, Glagola's commission structure under his 2019 IC Agreement set forth the following commission rates:

| COMMISSION STRUCTURE | |
|---|---|
| **Calendar Year Gross Commissions** | **Base Participation** |
| $0 to $300,000 | 50.0% |

| | |
|---|---|
| $300,001 to $450,000 | 55.5% |
| $450,001 to $750,000 | 60.0% |
| $750,001 to $1,000,000 | 65.0% |
| $1,000,000+ | 70.0% |

*Id.* Under this structure, Glagola would earn a commission of 50% of the brokerage revenue between $0 and $300,000 earned by TCW for Glagola's services in a calendar year, and a commission of 55.5% on brokerage revenue between $300,001 and $450,000. *Id.* The parties dispute whether commissions are calculated based on the calendar year that a deal closed *and/or* the year that the revenue was earned by TCW. *Id.* at 14 n.1 ("Commissions were calculated based on the calendar year that a deal was closed and the revenue was earned by TCW."); Trainor's Opp'n Ex. 1 at 4, ECF No. 71-1 (citing Trainor's deposition testimony explaining a commission is calculated when a deal is closed).

### i.    Glagola & Trainor's Split Agreement

In 2016, Glagola and Trainor agreed to work together in their brokerage efforts and formed the Mid-Atlantic Capital Markets Group ("MACMG"). (Trainor's Mot. Summ. J. Ex. 1 at 6, ECF No. 58-1). Their "initial agreement covered how they would share overhead expenses—including paying salary and bonuses to junior staffers—as well as how they would split commissions." (Glagola's Mot. Summ. J. at 10, ECF No. 67). In 2016 and 2017, Glagola and Trainor pooled and split their commissions, with Glagola receiving 35% and Trainor receiving 65%. *Id.* at 11.

In 2018, they decided to memorialize their agreement in writing, and executed "Mark and Gerry's 2018 and 2019 Agreement" ("2018/2019 Split Agreement") on May 14, 2018. (Glagola's Mot. Summ. J. Ex. 7, ECF No. 68). The agreement provided verbatim, and in full:[4]

---

[4] Glagola and Trainor refer to themselves by their first names. "Mark" is Mark Glagola, and "Gerry" is Gerald Trainor.

**Splits:**

2018 - Mark 37.5/Gerry 62.5
2019 – Mark 40/Gerry 60
Gerry's Cherner, and Schaffer land deals are excluded.

**Reimbursements:**

At the beginning of the year, we will build a reserve for Jim's pay/bonus money as well as Bonus money for Tom and other team member [sic]. Jim target salary is $300,000+/-. The goal is to build a reserve of $250,000 (Mark to contribute $93,750- 37.5% in 2018). Assuming an average 60% split with the house, Mark will give up $156,250 in gross commissions. Gerry will hold the money and pay everyone as needed. We will also do a reconciliation at the end of the year.

The same process will apply for 2019 and will be adjusted accordingly for splits [sic]

**$72,000 (After tax money – assuming a 40% tax rate it is $120,000 before taxes) Loan that Mark owed Gerry:**

This money will be forgiven evenly ($5,000/month) over 2 years, starting Jan. 1, 2018. If Mark leaves Transwestern or does not honor this agreement, then Mark will owe Gerry the unamortized money.

*Id.* (emphasis in original).

Glagola and Trainor renewed their agreement in 2020 ("2020 Split Agreement"). The 2020

Split Agreement is memorialized in a February 16, 2020 email from Trainor to Glagola:

Mark,

As discussed, for the period 1/1/20 to 6/30/20 we will continue to split commissions 60/40 with the exception of any property that Dweek buys or sells and the two land parcels (1800 New York Avenue land parcel that Jemal brought from Schaffer and the Cherner site). In addition, we will reserve $225,000 for this six month period to cover salary bill backs and bonuses. Please acknowledge that you are in agreement.

(Glagola's Mot. Summ. J. Ex. 8, ECF No. 68). Glagola acknowledged agreement via email on

February 21, 2020. *Id.*

It is undisputed that the 2018/2019 and 2020 Split Agreements pertained, at the very least,

to commissions. *Id.*; Glagola's Mot. Summ. J. at 10, ECF No. 67; Trainor's Mot. Summ. J. at 6,

ECF No. 58-1. Glagola and Trainor further agree that neither Split Agreement applied to returns received on personal investments in commercial real estate projects which they were offered from time to time. (Trainor's Mot. Summ. J. at 7, ECF No. 58-1). They also agree that the commission split percentage was determined from calendar year that a particular deal *closed*. *Id.*; Glagola's Mot. Summ. J. at 12, ECF No. 67).

Two critical issues, however, are disputed: at what point in time a deal is considered to close, and what constitutes a commission. Glagola cites to Trainor's deposition testimony stating simply that the calculation would be based on the calendar year when "the deal closes," as well as the testimony of TCW's corporate representative that split percentages are pulled from the calendar year that the "money comes in." (Glagola's Mot. Summ. J. Ex. 6, Trainor Dep. Tr. at 15:5, ECF No. 67; Ex. 5, Foery Dep. Tr. at 41:2, ECF No. 68). Trainor contends that "a closing happens when the actual deal papers are executed" and that "[t]he date that any money paid pursuant to a deal does not at all constitute a separate 'closing' date." (Trainor's Opp'n at 6, ECF No. 71-1). With respect to commissions, Glagola defines the term as "the brokerage revenue of [TCW] that would be allocated to one or both of [Glagola and Trainor]," effectively limiting the agreement to money first received by TCW. (Glagola's Mot. Summ. J. at 12-13, ECF No. 67). Trainor advocates for the plain meaning "commissions," and maintains that the Split Agreements broadly applied to all fees (which he uses synonymously with commissions) resulting from brokerage efforts which were not investment revenue. (Trainor's Mot. Summ. J. Ex. 1 at 2, ECF No. 58-2).

Trainor and Glagola each provide examples of past conduct in support of their interpretations of the Split Agreements. Trainor describes a 2018 consulting arrangement he secured with Gonzaga High School ("Gonzaga") regarding the valuation and leasing of a parcel of land the school owned. (Trainor's Mot. Summ. J. Ex. 2 at 2-3, ECF No. 58-2). Pursuant to

8

Trainor's Consulting Services Agreement with Gonzaga, he would be paid $40,000 in consulting fees and a success fee of an additional $20,000 if the school successfully leased the property. *Id.* Although Trainor's fee was not tied to the value of the property leased, he "nevertheless applied the Split Agreement to his consulting fee *and* to the project success fee that Gonzaga paid because they were 'fees' related to services he performed that pertained to commercial real estate." *Id.* (emphasis in original).[5]

Glagola references a project involving an Amazon warehouse located at 6884 Commercial Drive in Springfield, Virginia as illustrative of the parties' course of dealing under the Split Agreements. (Glagola's Mot. Summ. J. at 15-16, ECF No. 67). Trainor and Glagola received five separate commission payments from TCW for their work on this project: "(1) for locating and brokering the sale of the land; (2) for raising equity in the project; (3) for selling the project after it was built; (4) a referral fee for the lease in the building by Amazon; and (5) a referral fee for the lease in the building by Goodman." *Id.* at 16 (citing Ex. 10). Glagola explains that TCW first earned a fee in 2017 in connection with their efforts locating and brokering the sale of the land, and earned a final fee in 2020 for selling the project after it was built. *Id.* Glagola and Trainor's splits of TCW's commission revenue were determined by the applicable percentage for the year that each respective deal closed. *Id.* Although the project was initially brought in the door in 2017, when the project was sold in 2020, the commission allocated to Trainor and Glagola was split 60% to Trainor and 40% to Trainor, which was the agreed split percentage for 2020. *Id.* at 17.[6]

## ii.    Investment Opportunities

---

[5] Glagola does not dispute Trainor's account of these facts, but raises objections regarding their relevance and maintains that the Split Agreement applies to the Gonzaga fees because they were brokerage revenue of TCW.
[6] Trainor does not dispute Glagola's account, but notes "that for each of the five different commission payments, there was a separate listing agreement and a deal that closed in separate years." Although commissions were paid each year, because they were each tied to separate deals, he argues this example is inapposite to the instant case. (Trainor Opp'n at 8, ECF No. 71-).

In addition to payment under the commission structure, Trainor and Glagola both had opportunities to invest in TDC projects, including in projects on which they provided services on behalf of TCW. *Id.* at 17. For example, Trainor held a 14.3719% interest in TDC Springfield Partners LP, LLC ("TDC Springfield"), an entity created for the project at 6883 Commercial Drive in Springfield, Virginia. (Glagola's Mot. Summ. J. Ex. 12, ECF No. 68). Glagola notes this percentage is substantially greater than Trainor's other investments, and that Trainor invested $200,000 in this project and received $1,267,473 in distributions. *Id.* According to testimony from both Trainor and Carleton Riser, TDC's president, Trainor was given the opportunity for a larger investment in TDC Springfield because he brought in the business as a sourcing agent. *Id.* at 18. Riser explained that it was TDC's "typical structure" to offer a five percent investment allocation to the sourcing agent and was aware that this was the case for Trainor's TDC Springfield investment. (Glagola's Mot. Summ. J. Ex. 14, Riser Dep. Tr. at 75:1-8, ECF No. 68). Trainor testified that he could not recall whether he informed Glagola that he was offered a larger investment opportunity for sourcing the deal, but when asked whether he would discuss these kinds of opportunities with Glagola, he stated, "I don't discuss my personal financials and investments with anybody." (Glagola's Mot. Summ. J. Ex 6, Trainor Dep. Tr. at 25:19-21, 26:18-21, ECF No. 67).

### iii.    The Penn Commerce and Condor Projects

TDC and TDC Logistics retained Trainor and Glagola's group, MACMG, to market and find investor funding for a commercial development project called the Penn Commerce Logistics Center ("Penn Commerce") in 2016.  (Trainor's Mot. Summ. J. Ex. 2 at 3, ECF No. 58-2). Glagola ultimately helped facilitate a joint venture agreement between the TDC companies and CalSTRS in 2018. (Glagola's Mot. Summ. J. at 19, ECF No. 67). The agreement was structured such that

CalSTRS put up 100% of the equity in the Penn Commerce project, meaning that the TDC companies had no ownership interest in the project's development and there were no investment opportunities available to Glagola, Trainor, or anyone else. *Id.* Instead, the TDC companies had a "fee plus bonus" arrangement with CalSTRS, under which "if the TDC companies successfully stabilized the value of the project, they would receive a bonus based on the percentage of the value of the project" ("Project Success Bonus"). *Id.*

The Penn Commerce project had two phases: in the first, CalSTRS put up 100% of the equity to develop the project and TDC would receive a Project Success Bonus. *Id.* at 20. In the second phase, the TDC companies would sell the land or develop it, with CalSTRS again putting up 100% of the funding and the TDC companies receiving a second Project Success Bonus. *Id.* After the Penn Commerce project, the TDC companies entered into another, similarly structured venture with CalSTRS for a development project called Condor. *Id.* Like Penn Commerce, CalSTRS put up 100% of the equity in Condor and there were no investment opportunities in this project either. *Id.* TDC paid a flat fee of $250,000 to TCW for the facilitation of the TDC and CalSTRS joint venture agreement in Penn Commerce. (Trainor's Mot. Summ. J. at 10, ECF No. 58-1). TCS withheld a portion of the payment, and the remainder was split between Trainor and Glagola pursuant to the 2018/2019 Split Agreement, with 62.5% going to Trainor and 37.5% to Glagola. *Id.*

Riser sent the following email to Glagola on August 2, 2018 in reference to Glagola's facilitation of the Penn Commerce venture agreement:

> Thanks for working it. Also, we have not discussed it but I am going to dial you in on the promote on Penn Comm. You did great work and we did not have equity to allocate. I'll circle back next week.

(Glagola's Mot. Summ. J. Ex. 19, ECF No. 68).[7] The CalSTRS venture agreement was executed

on August 22, 2018. (Glagola's Mot. Summ. J. at 21, ECF No. 67). In April 2019, Glagola emailed

John Thomas, then a managing partner of TDC, requesting 10% of the proceeds that would be

distributed to partners for Penn Commerce and 2% of the proceeds for Condor. (Glagola's Mot.

Summ. J. Ex. 20, ECF No. 68). Riser subsequently emailed Thomas, stating:

> I don't think 10% is appropriate – I do think 5% is. We paid Mark $250k
> commission directly out of TDC's pocket. And, if this were a straight up equity
> deal he'd likely have gotten a 4% allocation of the equity for 'sourcing' even though
> he really did not source the deal. If 2% on Condor smooths all over I would support
> that as well…

(Glagola's Mot. Summ. J. Ex. 21, ECF No. 68).[8] On May 28, 2019, Glagola sent another email to

Thomas and Riser, noting that despite initiating numerous attempts to resolve the outstanding issue

of compensation for "the CalSTRS/Principal relationship," he had yet to receive a formal response.

(Glagola's Mot. Summ. J. Ex. 22, ECF No. 68). He once again proposed that he should receive "a

10% position on the partnership level for Penn Commerce and 2% for the CA [Condor] deal." *Id.*

Shortly thereafter Riser and Thomas corresponded via email to formulate a response to Glagola's

request. Riser proposed the following:

> I think the direction is this:
>
> - We will lock in the 5% on the promote component to Penn Comm – this is in line
>   with what he'd have been allocated as equity and we paid his fee out of our
>   development on this deal
> - We can lock something like that in if we earn a land lift on Phase II. 5% may be
>   too high…

---

[7] The parties dispute the meaning of "promote" in this context. Glagola states that it refers to the Project Success Bonus, (ECF No. 67 at 21), while Trainor says there is no indication that Riser intended to reference the Project Success Bonus. (ECF No. 71-1 at 10). TCW and the TDC companies state simply that the email speaks for itself. (ECF No. 72-1 at 7; ECF No. 73-1 at 7).

[8] Exhibit 21 appears to be missing the page with the quoted text. However, because none of the other parties dispute its accuracy, the Court will include it.

- I'm fine with the 2% on CA – I'm not sure how to address the long term other than the commitment to get him an equity piece of all the CalSTERS [sic] deals and you've gone there already with the MLP discussion.
- I'm fine with some seat at the table as it related to CalSTERS [sic] – however, he has got to realize that we were working with Principal prior to Penn Comm and will surely do more biz with them outside of CalSTERS [sic]

(Glagola's Mot. Summ. J. Ex. 23, ECF No. 68).

Glagola and Thomas reached an agreement by phone,[9] which Thomas then memorialized by email on May 29, 2019:

> Mark – as follow up to our conversation let this memorialize the deal
>
> Penn Commerce Phase one – 5%
>
> Penn Commerce Phase two – If we end up being the developer then 5% as in Ph1; assuming we sell the land only, we will determine the correct amount of participation give [sic] the final results
>
> Condor Road Project – 2%
>
> Going forward Calstrs [sic] business – tbd given the particulars of the deals and the circumstances.
>
> Confirm agreement and I will send out accounting group and Cindi Trapp for their records

(Glagola's Mot. Summ. J. Ex. 24, ECF No. 68). Glagola confirmed his acceptance of the agreement by email the same day. *Id.* This May 2019 agreement was the subject of Glagola's 2021 lawsuit, which terminated in this Court granting summary judgment to Glagola and awarding Glagola over $1.3 million in damages, together with pre-judgment interest and a declaration that Glagola was entitled to 5% of the Project Success Bonus that the TDC companies would receive for Phase II of the Penn Commerce project. *See generally Glagola*, 2022 WL 2916169.

---

[9] Trainor doesn't dispute the existence of this phone call, but states he lacks personal knowledge of whether it occurred. (Trainor's Opp'n Ex.1 at 11, ECF No. 71-1).

In his deposition, Riser confirmed that the May 29, 2019 agreement was separate and apart from the $250,000 commission that was allocated to TCW, Glagola, and Trainor, and was intended to "mimic" the investment opportunities that would have typically been available if CalSTRS had not invested 100% of the equity in the projects:

> [I]n a typical deal, he would have gotten a 5 percent, like a sourcing fee. Or – or – the people responsible for the sourcing, which would typically be channeled through [TCW], they would then offer it to that – to that broker or that independent agent or whatever you want to call them in the case.
>
> The deals [i.e., Penn Commerce and Condor], we did not have a direct investment opportunity, so the intent was to mimic the percentage interest that those individuals would have received had we had a direct investment opportunity.

(Glagola's Mot. Summ. J. Ex. 14, Riser Dep. Tr. at 27:14 – 28:3, ECF No. 68). According to Riser, "the agreement contemplated a payment directly to Mr. Glagola, not to TCW." *Id.* at 46:4-19. Glagola forwarded Thomas's May 29, 2019 email documenting their agreement to his superiors at TCW, Keith Foery and Phillip McCarthy, that same day. (Glagola's Mot. Summ. J. Ex. 26, ECF No. 68).[10]

### iv.    Termination of Glagola's Agreements with TCW and Trainor

The parties agree that Glagola and Trainor's 2020 Split Agreement terminated at the end of June, 2020. (Glagola's Mot. Summ. J. Ex. 8, ECF No. 68). Glagola subsequently resigned from TCW, and the 2019 Glagola IC Agreement was terminated pursuant to a September 18, 2020 Termination Agreement ("Glagola Termination Agreement"). (Glagola's Mot. Summ. J. Ex. 9, ECF No. 68). Exhibit A to the Glagola Termination Agreement identified outstanding deals for

---

[10] Trainor asserts that Glagola communicated to him prior to negotiating the May 2019 Agreement that he was dissatisfied with the $250,000 commission and would approach TDC about paying them a portion of the Project Success Bonus. (Trainor's Mot. Summ. J. at 11, ECF No. 58-1). According to Trainor, he agreed with Glagola, but after Glagola made no progress for several months "Trainor assumed that Glagola had given up and/or that TDC had refused." *Id.* Glagola disputes Trainor's account, but also contends that these are not material facts because they are not relevant to whether the Split Agreements applied to the TDC payment.

which Glagola would receive commissions if they closed within three months of his termination, and specified splits of those commissions with other TCW agents (including Trainor). *Id*. The Penn Commerce and Condor projects are not referenced in Exhibit A. *Id.*

### b. Procedural History

As previously explained, Glagola sued the TDC companies in 2021 for breach of the May 2019 Agreement. This Court determined that Glagola was entitled to summary judgment as a matter of law and entered a judgment of $1,333,715.33 in Glagola's favor, accounting for 5% of the Project Success Bonus for Phase I of Penn Commerce and 2% of the Project Success Bonus for Condor. *Glagola*, 2022 WL 2916169, at *6. The undersigned further declared that Glagola was entitled to 5% of the Project Success Bonus for Phase II of Penn Commerce and awarded Glagola pre-judgment interest. *Id.* The TDC companies appealed this Court's decision, which was ultimately affirmed by the Fourth Circuit on July 26, 2023. *Glagola*, 2023 WL 4759125, at *1. On August 16, 2024, Glagola filed a Notice of Satisfaction indicating that TDC had paid him a total of $1,837,821.73. (Glagola's Notice of Satisfaction of J., Glagola v. Transwestern Dev. Co., No. 21-1230 (D. Md. Aug. 16, 2023), ECF No. 58).

Trainor contends that although he "had heard in 2022 that Glagola was in litigation with TDC, he did not learn or investigate any details of that lawsuit and presumed that it pertained to a private investment that Glagola made in a TDC project." (Trainor's Mot. Summ. J. at 12, ECF No. 58-1). He states that he did not discover the details of the lawsuit until January 2023, at which point the case was pending on appeal. Trainor filed the instant action against Glagola and TDC on March 31, 2023, asserting an anticipatory breach of contract claim and seeking a declaratory judgment that he is contractually entitled to 62.5% of all amounts paid by TDC to Glagola for the Penn Commerce and Condor Projects. (Compl., ECF No. 1). Glagola then filed a claim, also for a

declaratory judgment regarding rights to the TDC payment, against Trainor, TDC, TDC Logistics, and TCW, as well as claims for recoupment and accounting against Trainor. (Glagola's Countercl., ECF No. 4). TCW thereafter filed a declaratory judgment claim against Trainor and Glagola, also claiming an interest in the TDC payment, and asserted a breach of contract action against Trainor on the basis that he breached his 2019 IC Agreement by failing to pay TCW a portion of the TDC payment. (TCW's Countercl., ECF No. 24).

All parties have filed motions for summary judgment, which are currently pending before this Court. (ECF Nos. 58, 59, 60, & 67). Trainor additionally filed a Motion for Leave to File an Amended Complaint four days before filing his Motion for Summary Judgment, which is also pending. (Trainor's Mot. Leave Am., ECF No. 57).

## II.    LEGAL STANDARD

### a.  Leave to Amend Complaint

Rule 15(a)(2) of the Federal Rules of Civil Procedure instructs the court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, when a party seeks leave to amend their complaint after the deadline to amend pleadings set forth in the scheduling order has expired, they must first demonstrate "good cause" under Rule 16(b)(4) before also satisfying the Rule 15(a)(2) standard. *Cook v. Howard*, 484 F. App'x 805, 814-15 (4th Cir. 2012); *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. DKC 12-1822, 2016 WL 3668028, at *2 (D. Md. July 11, 2016) (explaining that where the deadline for amending pleadings had passed, "Plaintiffs must do more than satisfy the liberal standard of Fed. R. Civ. P. 15(a); they must first meet the mandates of Fed. R. Civ. P. 16(b)(4), which calls for 'good cause' to modify a scheduling order.").

16

The moving party bears the burden of demonstrating good cause. *Henson v. NaturMed, Inc.*, No. ELH-18-1102, 2019 WL 2142531, at *2 (D. Md. May 15, 2019). "'Good cause' requires 'the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence[.]'" *Cook*, 484 F. App'x at 815 (quoting 6A Charles Alan Wright, Arthur R. Miller, and Mark Kay Kane, *Federal Practice and Procedure Civ.3d* § 1522.2 (3d ed. 2010) (collecting cases)). In determining whether a party has shown good cause, courts may consider "whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party." *Henson*, 2019 WL 2142531 at *2 (quoting *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 519-20 (D. Md. 2014)). However, the Fourth Circuit has cautioned that whatever other factors are considered, "'the good cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule.'" *Cook*, 484 F. App'x at 815; *see also Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) (quoting *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995) ("[T]he focus of the inquiry is upon the moving party's reasons for seeking modification. *If that party was not diligent, the inquiry should end.*").

### b. Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his]

17

pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"
*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

## III.   ANALYSIS

### a.  Maryland Law Applies in this Diversity Action

The parties agree, as does the Court, that Maryland law governs in this breach of contract action. A court sitting in diversity applies the choice of law rules of the forum state, which, in this case, is Maryland. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). For breach of contract claims, Maryland applies the 'lex loci contractus' principle, utilizing the law of the state where the contract was formed unless the parties contractually agree to the law of another state. *State Auto. Mut. Ins. Co. v. Lennox*, 422 F. Supp. 3d 948, 961 (D. Md. 2019). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr. Inc. v. WHE Assocs.*, 790 A.2d 720, 728 (Md. Ct. Sp. App. 2002). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Cty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008).

Trainor and Glagola's 2018/2019 Split Agreement was executed on May 14, 2018. Glagola's Mot. Summ. J. Ex. 7, ECF No. 68). At that time, they are both worked out of TCW's Maryland office and transacted business in Maryland. Given that the parties also agree that Maryland law applies in this matter, it appears that the contract was formed in Maryland. Accordingly, Maryland law on contracts applies in this case.

### b.  Trainor's Motion for Leave to Amend his Complaint

When Trainor first filed the instant action on March 31, 2023, the TDC companies' appeal in the 2021 lawsuit was still pending in the Fourth Circuit and Glagola had not yet received the monetary award. Trainor therefore alleged two counts in his complaint: anticipatory breach of contract and declaratory judgment. (Compl., ECF No. 1). Since initiating this action, the TDC companies have paid Glagola in full, as evidenced by the notice of satisfaction Glagola filed on August 16, 2023. Trainor accordingly seeks to amend his complaint, streamlining his claims to a single breach of contract count against Glagola and dismissing TDC as a party to the complaint. (Trainor's Mot. Leave Am. at 2-3, ECF No. 57).

Trainor cites solely to the Federal Rule 15(a) standard in his motion, arguing that a motion to amend a complaint should be freely granted when justice so requires, "unless there is a valid reason for denying leave such as undue delay, bad faith, or futility of amendment." *Id.* He further cites case law for the proposition that "a lack of prejudice alone ordinarily warrants granting leave to amend." *Id.* (citing *Ward Electronics Serv., Inc. v. First Com. Bank*, 819 F.2d 496, 497 (4th Cir. 1987)). Trainor contends that his proposed amendment is not prejudicial to Glagola because it merely simplifies the case, explaining that "[i]nstead of determining the parties rights under the split agreement under the declaratory judgment count and then whether there has been an anticipatory breach of that split agreement, Trainor's complaint now alleges the existence of the

split agreement, that Trainor was entitled to a share of the award Glagola received from TDC, and that Glagola materially breached the split agreement when he failed to pay Trainor." *Id.* at 4-5. He further contends that no additional discovery will be required, and that the amendment would occur prior to the filing of dispositive motions in this matter. *Id.* at 4.

Glagola opposes Trainor's Motion for Leave to Amend, correctly identifying that because the deadline to amend pleadings was December 15, 2023, and Trainor moved to amend his complaint on September 12, 2024, Trainor is required to demonstrate "good cause" under Federal Rule 16(b)(4) before also satisfying the more lenient Rule 15(a) standard. Glagola's Opp'n to Mot. Leave. Am. at 4, ECF No. 61; *Cook*, 484 F. App'x at 814-15; *Humane Soc'y*, 2016 WL 3668028 at *2. Glagola points out that Trainor's Motion for Leave is silent as to whether there is good cause to amend the scheduling order, and raises concerns that amendment at this late stage in the litigation prejudices him because Trainor contends, for the first time, that he is entitled to damages because Glagola "violated the implied covenant of good faith and fair dealing." *Id.* at 4-5.

Trainor responds in his Reply brief that his reference to the covenant of good faith and fair dealing is not the introduction of a new claim, and could not possibly be because "Maryland courts do not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing." (Trainor's Reply at 2, ECF No. 66) (citing *Md. Physician's Edge, LLC v. Behram*, No. 17-cv-256-DKC, 2019 WL 4573417, at *8 (D. Md. Sept. 20, 2019)). Trainor also maintains that good cause exists for modifying the scheduling order because "[u]pon drafting the dispositive motion Trainor submitted to this court, Trainor realized he could streamline his complaint to a single cause of action for breach of contract against a single defendant." *Id.* at 5. He further argues that amendment is "[i]n the interest of simplicity and judicial economy[.]" *Id.*

20

While it may be the case that Trainor's proposed amendments would streamline his claims and simplify this matter, the Court finds that Trainor has failed to satisfy the good cause standard under Federal Rule 16(b)(4). As previously explained, "'[g]ood cause' requires 'the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence[.]'" *Cook*, 484 F. App'x at 815 (citation omitted). Trainor does not state when he discovered that the judgment awarded to Glagola was satisfied, but he was aware of the pending appeal at the time he filed his own lawsuit. Glagola filed the notice of satisfaction of judgment on August 16, 2023, and Trainor's counsel had notice that Glagola had been paid in full, at the latest, at Glagola's May 20, 2024 deposition. [11]

Despite having notice of the information necessitating amendment in, at the latest, May 2024, Trainor filed his Motion for Leave to Amend in September, one month after the close of discovery and only four days before the deadline for dispositive motions. While the Court agrees that the proposed amendment does not substantively alter Trainor's claims and likely would not require additional discovery, these circumstances simply do not support a finding of diligence. *See Howard v. Inova Health Care Servs.*, 302 F. App'x 166, 181 (4th Cir. 2008) ("[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent.") (quoting *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987)); *Wall v. Fruehauf Trailer Servs., Inc.*, 123 F. App'x 572, 576-77 (4th Cir. 2005) (finding good cause under Rule 16(b)(4) where plaintiff moved for

---

[11] In reviewing the parties' dispositive motions filings, the Court noted that Glagola testified that the judgment against the TDC companies was satisfied at his May 20, 2024 deposition. (Trainor Mot. Summ. J. Ex. 3 at 88:16-20, ECF No. 58-4).

leave to amend immediately after learning information requiring amendment).[12] Trainor's Motion

for Leave to File Amended Complaint (ECF No. 57) will therefore be denied.[13]

### c. TDC and TDC Logistics' Motion for Summary Judgment

TDC and TDC Logistics jointly move for summary judgment with respect to Trainor's

claim against TDC, Glagola's cross-claim against TDC, and Glagola's third-party claim against

TDC Logistics. (TDC's Mot. Summ. J., ECF No. 59). All three claims against TDC seek

declaratory relief with respect to the monetary judgment entered against the TDC companies in

the 2021 litigation. *Id.* "The Declaratory Judgment Act, 28 U.S.C. § 2201, grants federal district

courts the discretionary power to entertain declaratory judgment actions." *Nationwide Mortg.*

*Corp. v. FISI Madison, LLC*, 219 F. Supp. 2d 669, 672 (D. Md. 2002) (citing *Wilton v. Seven Falls*

*Co.*, 515 U.S. 277 (1995)). "A federal court has discretion to entertain a declaratory judgment

action if the relief sought (i) 'will serve a useful purpose in clarifying and settling the legal relations

in issue' and (ii) 'will terminate and afford relief from the uncertainty, insecurity, and controversy

giving rise to the proceeding.'" *Id.* (quoting *Continental Casualty Co. v. Fuscardo*, 35 F.3d 963,

965 (4th Cir. 1994)); *see also Terra Firma, LLC v. Wicomico Cnty., Md.*, No. GLR-21-137, 2022

WL 899446, at *10 (D. Md. Mar. 28, 2022) (quoting same).

The TDC companies argue that because the Court already entered judgment against them

in 2021, and that judgment has been satisfied, there is no useful purpose to them remaining parties

in this case. (TDC's Mot. Summ. J. at 6, ECF No. 59). Glagola opposes the TDC companies'

motion, contending that "[a]lthough TDC and TDC logistics have satisfied the judgment in the

---

[12] Additionally, the fact that Trainor addresses the good cause standard for the first time in his Reply brief indicates a lack of diligence. *See Henson*, 2019 WL 2142531 at *4 ("A failure to address Rule 16(b) in a motion to amend is 'a lack of diligence—without which the court is hard-pressed to conclude that good cause exists to modify the scheduling order.'") (quoting *Humane Soc'y*, 2016 WL 3662028, at *4).

[13] Because this motion is decided under Federal Rule 16(b)(4), the court need not reach the Rule 15(a) standard, and declines to address the parties' arguments regarding prejudice.

prior litigation, each entity has propped up the claims of Trainor and TCW by providing contradictory testimony regarding the May 29, 2019 agreement." (Glagola's Mot. Summ. J. at 44, ECF No. 67).[14] This argument, however, does not speak to the declaratory judgment standard outlined above and is not an adequate basis to justify TDC and TDC Logistics' continued participation in this litigation.

In his initial Complaint, Trainor seeks an order declaring:

a. Trainor and Glagola are parties to a contract (their Split Agreement) that requires Trainor to be paid 62.5% of all compensation, commission, and remuneration for projects, relationships, and developments that they facilitated or otherwise brokered (whether together or through their individual efforts) as follows: 62.5% to Trainor and 37.5% to Glagola for all deals or other projects closed in 2018, and 60% to Trainor and 40% to Glagola for all deals or other projects closed in 2019;

b. Pursuant to that Split Agreement, Trainor is entitled to be paid 62.5% of all money, whether classified as commissions, incentive payments, or otherwise, that TDC owes to Glagola pursuant to the Trainor/Glagola May 2019 Agreement;

c. Trainor is entitled to disbursement directly to him of 62.5% of the funds on deposit in this Court's registry that TDC paid pursuant to the August 29, 2022, Appeal Bond Order (Doc. 56) in Civil Action No. 1:21-01230-JMC, if and when any such funds are to be disbursed;

d. TDC shall pay directly to Trainor 62.5% of any and all monies that TDC owes pursuant to the May 2019 Agreement, and shall not disburse to Glagola more than 37.5% of any money owed pursuant to the May 2019 Agreement unless otherwise ordered by this Court, following resolution of this Action.

(Compl. at 8, ECF No. 1). Regarding TDC, the relief Trainor seeks could only have occurred prior to disbursing payment to Glagola. *See id.* at Paragraph (d). While it made sense to name TDC as a defendant in this action prior to their payment to Glagola, once the payment was made, any

---

[14] Trainor does not address the TDC companies' Motion for Summary Judgment in his filings, likely because he had already moved to amend his complaint and remove TDC as a party at the time he filed his Motion.

controversy involving them was resolved. Likewise, the declaratory relief Glagola seeks does not

seek clarification or settlement of legal issues directly involving TDC or TDC logistics:

> Finding and declaring that: (1) the 2018 Glagola/Trainor Agreement is of no force
> and effect; (2) that every agreement between Glagola and Trainor concerned only
> the allocation of commissions earned by TCS for services performed by Glagola
> and/or Trainor and did not concern agreements or investments that Glagola or
> Trainor entered into with third parties like the TDC Companies; (3) that Glagola
> and Trainor terminated their relationship and any agreement between them such
> that, regardless of the terms of Glagola and Trainor's operative agreement, Trainor
> had no rights to any monies due to Glagola under his May 29 Agreement with the
> TDC Companies; (4) that no agreement between Glagola and Trainor concerned
> monies (commissions or otherwise) that were not collectible until 2021 or beyond,
> such that Glagola had no obligation to Trainor with respect to the money owed to
> Glagola under the May 29 Agreement, which did not become due and owing until
> December 2021 or later; (5) that Glagola complied with his 2019 Independent
> Contractor Agreement with TCS; and (6) that Trainor did not comply with his
> independent contractor agreement with TCS[.]

(ECF No. 4 at 25-26).

It is undisputed that the TDC companies have satisfied the 2021 judgment against them in

full. Neither entity asserts any claim to the money paid to Glagola in the present litigation. As

such, any controversy involving the TDC companies has been resolved and the Court agrees that

there is no useful purpose to their remaining parties in this litigation. TDC and TDC Logistics'

jointly filed Motion for Summary Judgment (ECF No. 59) shall be granted, and judgment shall be

entered in their favor as to all claims made against them..

### d.  Trainor's Motion for Summary Judgment and Glagola's Cross-Motion for Summary Judgment

Trainor and Glagola each move for summary judgment on their respective declaratory

judgment claims against one another.[15] Trainor argues that there is no "genuine dispute that the

---

[15] Trainor bases his Motion for Summary Judgment on his Amended Complaint, and therefore most of the language in his briefing refers to prevailing on a breach of contract claim. However, he notes that if the Court denies his

Split Agreement applies to the payment for the Penn Commerce and Condor projects that TDC paid [Glagola] pursuant to the May 2019 Agreement" and he is therefore entitled to summary judgment as a matter of law. (Trainor's Mot. Summ. J. at 14, ECF No. 58-1). He maintains that it is undisputed that the Split Agreements applied to, at minimum, commissions, and urges the Court to apply the dictionary definition of commission to the instant case: "a fee paid to an agent or employee for transacting a piece of business or performing a service." *Id.* at 17. According to Trainor, the money paid by the TDC companies to Glagola in satisfaction of this Court's 2022 judgment is undisputedly a commission and therefore subject to the Split Agreement.

Trainor additionally cites the definition for "gross commissions" supplied in Glagola's 2007 IC Agreement with TCW, deposition testimony by TCW's Executive Managing Director Keith Foery, *see* Trainor's Mot. Summ. J. Ex. 7, Foery Depo. Tr. at 175:20-176:19, ECF No. 58-8 ("[A] fee is a commission. Commission can be a fee, I mean."), as well as his and Trainor's past performance and the context in which the agreement was signed in support of his interpretation. (Trainor's Mot. Summ. J. at 18, ECF No. 58-1). Regarding course of performance, he refers to the fact that Trainor and Glagola split the $250,000 fee paid by TDC for their work on Penn Commerce pursuant to the Split Agreement, and their splitting of the Gonzaga High School consulting and success fees. *Id.* at 18-19. Trainor argues, in essence, that because the Gonzaga success fee was shared pursuant to the Split Agreement, the percentage Glagola negotiated to receive of the Penn Commerce and Condor Project Success Bonuses should also be split. *Id.* at 20.

Glagola agrees that the "2018/2019 Split Agreement unambiguously covered how Glagola and Trainor would split commissions earned and expenses shared between them in 2018 and

---

Motion for Leave to Amend, he alternatively moves for summary judgment on Count I of his original complaint, which is his declaratory judgment claim. (Trainor's Mot. Summ. J. at 3, ECF No. 58-1).

2019." (Glagola's Mot. Summ. J. at 28, ECF No. 67). However, he contends that "commissions" refers to each of their share of revenue earned by TCW, meaning that any money that was *not* owed to them by TCW would not be subject to the Split Agreement. *Id.* ("There is no provision in the 2018/2019 Split Agreement that suggests implicitly or explicitly that Glagola and Trainor had agreed to split anything other than money owed to them by TCW for revenue received by TCW that was generated by them for services rendered."). Glagola presents a number of arguments in support of his position. First, like Trainor, he cites to the definition of "gross commissions" in his 20017 IC Agreement, which provides that "[f]or the purposes hereof, the term 'gross commission' means all collected revenues [sic] CONTRACTOR's performance of services for [TCW] (but excluding Consulting Commissions earned prior to October 16, 2017 and Referral Fees, both referred to hereinbelow)." (Glagola's Mot. Summ. J. Ex. 2, ECF No. 68). It further states that contractors "shall be eligible to receive Referral Fees for originating property management business for the Company, with such Referral Fees to be in amounts and in accordance with the Company's policies regarding same." *Id.* Glagola argues that these definitions are highly relevant to the Court's analysis, limiting "commission" splits to revenues collected by TCW and expressly excluding referral fees. (Glagola's Mot. Summ. J. at 29, ECF No. 67).[16]

Glagola next argues that the context of his and Trainor's relationship supports his interpretation of the Split Agreements. *Id.* at 30-31. Specifically, he refers to each of their independent contractor agreements with TCW which "collectively treated commissions as brokerage revenues received by TCW" and the fact that "they each received various monetary benefits that were *never* treated as commissions and were *never* split by them." *Id.* at 31 (emphasis

---

[16] Glagola further explains that "[t]he 2019 Glagola IC Agreement was consistent with the 2007 Glagola IC Agreement." (Glagola's Mot. Summ. J. at 29, ECF No. 67).

in original). For example, Trainor's agreements permitted him to receive incentive fees for sourcing deals, such as offsetting costs for support staff if certain production thresholds were met, and guaranteeing "his ability to invest $500,000 a year for five years in projects that were estimated to generate as much as $5,000,000 in profit." *Id.* Additionally, the agreements both provided that disputes arising between agents regarding entitlement to brokerage revenue were required to be submitted to TCW, "which was the final arbiter of such disputes." *Id.*[17]

Glagola also refers to his and Trainor's prior course of dealing. *Id.* at 32. He asks the Court to compare Trainor's investment in the TDC Springfield project, in which Trainor was given the opportunity to invest in a greater percentage of the project because he sourced the deal, to his May 2019 Agreement with TDC, in which he was promised percentages of Project Success Bonuses for sourcing the Penn Commerce deals. *Id.* at 33 ("[J]ust like Trainor's sourcing bump on TDC Springfield—which he never disclosed to Glagola—was not recognition for the same services that generated five separate fees for TCW (fees which were split by Glagola and Trainor), neither was the money paid to Glagola pursuant to the May 29, 2019 agreement."). Riser's deposition testimony supports this comparison, as he testified that the May 2019 Agreement was contemplated as being "separate and apart from – from the commission that was paid to TCW for work that Mr. Glagola and his colleagues provided" and was intended to "mimic" the sourcing investment opportunities which would generally have been available to Glagola if CalSTRS had not invested 100% of the equity in Penn Commerce and Condor. (Glagola's Mot. Summ. J. Ex. 14, Riser Dep. Tr. at 27:14 – 28:3, 46:4-19, ECF No. 68). Finally, Glagola argues that the

---

[17] Glagola additionally argues that Trainor is barred from seeking relief because his entitled to commissions is derivative of TCW, and under his independent contractor agreement Trainor is required to submit commission disputes to TCW. (ECF No. 67 at 37). For the reasons stated later in this opinion, the Court declines to make a finding with respect to whether Trainor is entitled only to funds first received by TCW, and so will not address this argument.

2018/2019 Split Agreement only applied to deals which closed in 2018 and 2019, and has no application to his May 2019 Agreement with TDC, which did not close until the Penn Commerce Phase I and Condor deals closed in December 2021. (Glagola's Mot. Summ. J. at 36, ECF No. 67).

Although Trainor and Glagola repeatedly assert that no material facts are in dispute and they are each entitled to judgment as a matter of law, it is clear to the Court that many facts material to determining each of their rights under the Split Agreements are disputed. Interpretation of a contract is "ordinarily a question of law for the court." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 592 (D. Md. 2019). In interpreting a contract, "Maryland courts apply the objective theory of contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Id.* at 592 (citation omitted). The matter becomes more complicated, however, when contractual terms are not clear and unambiguous. The Fourth Circuit has explained that as to summary judgment motions regarding contractual interpretation:

> A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (internal citations and quotations omitted).

28

*Rock Spring Plaza II, Inc. v. Invs. Warranty of Am.*, 618 F. Supp. 3d 262, 267 (D. Md. 2022) (quoting *Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F. 3d 231, 234-35 (4th Cir. 2007)).[18] Ultimately, if "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances … the contract [is] submitted to the trier of fact for interpretation." *Id.* (quoting *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990)).

As dictated by the Fourth Circuit in *Washington Metro*, the Court first concludes that the 2018/2019 Split Agreement is ambiguous. The Agreement contains minimal details, does not define what precisely the parties agreed to split, and therefore may be reasonably interpreted to have more than meaning. *See* Glagola Motion, Ex. 7; *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) ("Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning."). Although the parties agree that the Split Agreement applies, at minimum, to commissions,[19] they each advocate for very different definitions of what constitutes a commission, and their positions are dispositive as to whether the payment made by TDC to Glagola need be divided under the Split Agreement. They also have different positions on the point in time at which a deal is considered to close, which is relevant to determining both whether the Split Agreement applies to TDC's payment to Glagola for the Penn Commerce and Condor deals, as well as the percentage they would each be entitled to if the Split Agreement is applicable.

---

[18] The *Rock Spring* court applied substantive Maryland law in this diversity breach of contract case. *Rock Spring*, 618 F. Supp. 3d at 268.

[19] Trainor and Glagola's renewal of the Split Agreement in 2020 via email further supports this conclusion, as Glagola wrote that they would "continue to split commissions" through June 30, 2020. (Glagola's Mot. Summ. J. Ex. 8, ECF No. 68).

Under different circumstances it is possible that these differences could be resolved through interpretation of extrinsic evidence. Here, however, the extrinsic evidence proffered by Trainor and Glagola leaves genuine issues of fact as to how the Split Agreement should be applied. They each cite to a range of conflicting extrinsic evidence in support of their respective interpretations, including the dictionary, their independent contractor agreements with TCW, the context into which they entered the Split Agreement, deposition testimony, and their past course of dealings. The examples of past conduct referenced by Trainor and Glagola are distinguishable from their current dispute over the Penn Commerce and Condor payments—the consulting and success fees paid by Gonzaga were a flat fee and were apparently "treated as brokerage revenue collected by TCW," while the TDC Springfield investment required Trainor to invest his own funds in the project. Further, their split of the Gonzaga consulting fee conflicts with the definition of "gross commissions" set forth in Glagola's 2007 IC Agreement,[20] which expressly excludes consulting fees. There is also conflicting testimony regarding whether the appropriate split percentage is determined from the year that a "deal closes" or the year when "money comes in," an issue which is also relevant to whether the 2018/2019 Split Agreement could apply to the May 2019 Agreement at all, when it could not possibly have been paid until December 2021. (ECF No. 67 at 14).

On this record, there are legitimate questions of fact as to the interpretation of the 2018/2019 Split Agreement and its application to the payment made by TDC to Glagola for the Penn Commerce and Condor deals. Summary judgment must be refused. *Rock Spring*, 618 F. Supp. 3d at 267; *see also Keyser v. Kemper*, 146 A.275, 277 (Md. 1929) ("[W]hen the written

---

[20] This definition is, of course, part of a contract between Glagola and TCW and not necessarily applicable to the 2018/2019 Split Agreement between Trainor and Glagola. The Court references it because both parties argue that it is relevant to interpreting the Split Agreements, and because it may be evidence of their individual understanding of a commission and/or the definition generally applied in the commercial real estate industry.

instrument on its face is so ambiguous as to necessitate the production of evidence outside the instrument in order to determine the true intention and real contract between the parties and where this evidence is conflicting, it presents a mixed question of law and fact, and should be submitted to the jury for their determination[.]"). Accordingly, Trainor's Motion for Summary Judgment (ECF No. 58) shall be denied. Glagola's Cross-Motion for Summary Judgment (ECF No. 67) with respect to his claims against Trainor shall also be denied.

### e. Glagola and TCW's Motions for Summary Judgment

TCW and Glagola both move for summary judgment with respect to: (1) Glagola's declaratory judgment claim against TCW requesting a declaration that he complied with his 2019 IC Agreement; (2) TCW's declaratory judgment claim against Glagola and Trainor seeking a declaration that TCW is entitled to a portion of the payment TDC made to Glagola in satisfaction of this Court's 2022 judgment;[21] and (3) TCW's breach of contract claim against Glagola. (Glagola's Mot. Summ. J., ECF No. 67; TCW's Mot. Summ. J, ECF No. 60). Both parties additionally seek to be declared the "Prevailing Party" so that they may be entitled to attorneys' fees under Glagola's 2019 IC Agreement. *Id.*

The following sections of Glagola's 2019 IC Agreement are relevant:

**Section 1(a):**

[TCW] hereby engages [Glagola], and [Glagola] hereby accepts engagement by [TCW], as a Qualified Real Estate Agent, to conduct business for [TCW] arising from the sale and leasing of commercial properties for and on behalf of [TCW] clients.

**Section 2(a):**

The relationship of [Glagola] to [TCW] established under this Agreement shall be that of an independent contractor and not as an employee for federal tax purposes. All or substantially all of [Glagola's] remuneration paid under this Agreement shall

---

[21] Trainor does not address TCW's Motion for Summary Judgement.

be based upon commissions, to which [Glagola] is entitled under the terms of this Agreement or under applicable law, for completed sales, leasing or like transactions, and not upon hours worked on any other basis.

**Section 2(d):**

Nothing contained in this Agreement shall be deemed to prohibit or preclude [Glagola's] participation in or ownership of other businesses, ventures, enterprises, or other investments, so long as such activities do not materially and adversely inhibit [Glagola's] ability to perform [Glagola's] obligations and responsibilities hereunder. All such activities and ownership interests shall be disclosed to [TCW] in writing.

**Section 4(b):**

[Glagola] shall be entitled to receive his/her portion of commissions earned by [TCW] for services performed by [Glagola] hereunder only after such Commissions have been received by [TCW], and, unless otherwise agreed, shall be disbursed to [Glagola] in accordance with [TCW's] routine commission-disbursement procedures as set forth in Exhibit A hereto. [Glagola] shall forward to [TCW] any Commission that [TCW] receives, and [TCW] shall hold all Commissions it receives in trust for [TCW] and [Glagola] to be divided according to the terms of this Agreement.

**Section 9:**

All listings and other real estate opportunities or matters as to which [Glagola] performs any services hereunder are at all times the sole and exclusive property of [TCW] and shall be treated as such by [Glagola].

(TCW's Reply Ex. 3, ECF No. 73-3). TCW argues that it is entitled to summary judgment because the services Glagola provided on the Penn Commerce and Condor projects were provided pursuant to his independent contractor contract with TCW under Section 9, and were therefore "the sole and exclusive property of [TCW]" and should have been treated as such by Glagola. (TCW's Mot. Summ. J. at 10, ECF No. 60). Thus, it argues, Glagola was obligated to forward to TCW "any commission that Glagola receive[d]" under Section 4(b), and because it is undisputed that he did not forward the payment received from TDC in satisfaction of the Court's 2022 judgment, Glagola breached the 2019 IC Agreement. *Id.* at 10-11.

Glagola contends that the May 29, 2019 agreement with TDC is subject to the exception set forth in Section 2(d), which allows him to participate in "other business, ventures, enterprises, or other investments" so long as he discloses such interests to TCW and they do not otherwise interfere with his obligations under the contract. (Glagola's Mot. Summ. J. at 39, ECF No. 67). He cites Riser's deposition testimony stating that the transaction was intended to "mimic what would have typically been a direct investment interest" and notes, correctly, that neither party disputes he provided notice of the May 2019 Agreement to TCW. *Id.* at 40. According to Glagola, because "it is undisputed that the money owed under [the May 2019] agreement was *not* revenue owned by TCW," he had no obligation to forward the payment to TCW. *Id.* at 41. Thus, he argues, he fully complied with the terms of his contract with TCW and is entitled to judgment as a matter of law. *Id.*

TCW counters that the question of whether the money owed under the May 2019 Agreement is revenue owned by TCW "is, quite simply, *very much disputed.*" (TCW's Reply at 10, ECF No. 73) (emphasis in original). The Court agrees that this fact is disputed and concludes, because this fact is material to both parties' claims, that summary judgment is not appropriate. Because the May 2019 Agreement with TDC was, undeniably, linked to Glagola's performance in sourcing the Penn Commerce and Condor deals while he was an independent contractor for TCW, there is a colorable argument that the payment was for work performed under the 2019 IC Agreement and should therefore be subject to the terms of the agreement. However, a reasonable factfinder could also conclude, based on the deposition testimony of Riser (who is not only the president of TDC but also "holds a majority ownership interest in the parent company of which TCW is a wholly-owned subsidiary") that the May 2019 Agreement is subject to the exception outlined in Section 2(d), which permits Glagola to participate in "other businesses, ventures,

enterprises, or other investments." (TCW's Reply Ex. 3, ECF No. 73-3). Further complicating the situation is Foery's (TCW's Managing Director) testimony that if Riser were to make a decision regarding a TDC deal involving a TCW agent, Foery would honor that decision and defer to Riser. (Glagola's Mot. Summ. J.  Ex. 14, Foery Dep. Tr. at 23:4-24:21, ECF No. 68). Because there is legitimate doubt as to whether TDC's payment in satisfaction of the Court's 2022 judgment should be characterized as revenue of TCW or as participation in a separate venture, summary judgment shall be denied. *See Rock Spring*, 618 F. Supp. 3d at 267 (citation omitted) (If "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances … the contract [is] submitted to the trier of fact for interpretation.").

Finally, the Court will briefly address Glagola's arguments regarding res judicata and waiver. "Under Maryland law, the elements of res judicata, or claim preclusion, are: (1) that the parties in the present action are the same or in privity with the parties to the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior action; and, (3) that there has been a final judgment on the merits." *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037-38 (Md. 2005) (citation omitted). Glagola urges consideration of whether res judicata bars TCW's claims, arguing that TCW is inextricably intertwined with TDC and TDC Logistics "such that its interests were adequately represented" in the earlier litigation between Glagola and the TDC companies. (ECF No. 67 at 42-43). Glagola further contends that the present suit arises from the same transaction as the first litigation, and is therefore precluded under the transactional theory of res judicata. *Id.* (citing *Norville*, 887 A.2d at 1038 ("Under the transactional approach, if the two claims or theories are based upon the same set of facts and one would expect them to be tried together ordinarily, then a party must bring them simultaneously.")).

The undersigned is not persuaded that TCW's claims are barred by res judicata. As to the first element, "[t]here are three generally recognized categories of non-parties who will be considered in privity with a party to the prior action and who will therefore by bound by a prior adjudication: (1) a non-party who controls the original action; (2) a successor-in-interest to a prior party; and (3) a non-party whose interests are adequately represented by a party to the original action." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (citation omitted). Only the third option, adequate representation, is relevant in this matter, as there are no allegations that TCW controlled the original action and TCW is not a successor in interest to the TDC companies. The Court finds that although TCW and the TDC companies are related to one another, they are still independent legal entities with distinct interests in the proceeds of the May 2019 Agreement. *Compare id.* ("To be in privity with a party to a former litigation, the non-party must be 'so identified with a party to a former litigation that he represents precisely the same legal right in respect to the subject matter involved.'" (citation omitted)). Further, the 2021/2022 litigation involved a dispute between Glagola and TDC over the May 2019 Agreement. TCW's current claims, which all stem its 2019 IC Agreement with Glagola, were simply not before the Court in the prior litigation. Glagola fails to demonstrate the first two elements of res judicata and this argument is accordingly rejected.

Glagola next maintains that because he provided notice to TCW of the May 2019 deal and it made no objection, TCW waived its right to claim money generated from that deal from the start. (Glagola's Mot. Summ. J. at 41, ECF No. 67). He additionally argues that the fact that TCW did not intervene in the prior lawsuit is further evidence of waiver. *Id.* TCW responds that it had no obligation to intervene in the original lawsuit, and that it promptly asserted its claim by filing an Amended Answer to Glagola's Third-Party Complaint (on September 11, 2023) following the

Fourth Circuit's mandate affirming this Court's grant of summary judgment and TDC's subsequent satisfaction of the judgment (on August 16 and 17, 2023, respectively). (TCW's Reply at 15-16, ECF No. 73).

"Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of such right, and may result from an express agreement or be inferred from circumstances." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Centre at Parole, LLC*, 25 A.3d 967, 984 (Md. 2011) (quoting *Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166, 172 (Md. 1964)). Whether certain conduct constitutes a waiver is generally a question of fact, best reserved for the trier of fact. *Id.* Although it is true that occasionally, waiver "is so obvious that a ruling can be made as a matter of law," that is not the case here. *Id.* There is simply not adequate evidence in the record for the Court to determine, as a matter of law, that TCW intentionally relinquished any right to the payment TDC made to Glagola.[22] *See Woznicki v. GEICO Gen. Ins. Co.*, 115 A.3d 152, 167 (Md. 2015) ("A waiver of a contractual provision must be clearly established and will not be inferred from equivocal acts or language.") (citation omitted). For the aforementioned reasons, the Court also declines to grant Glagola summary judgment on the basis that TCW waived its right to the TDC payment.

## IV.    **CONCLUSION**

For the foregoing reasons, it is this <u>10th</u> day of March, 2025, hereby ORDERED that:

1) Plaintiff/Counter-Defendant Trainor's Motion for Leave to Amend the Complaint (ECF No. 57) is DENIED;

---

[22] Although Glagola does not make this argument, the Court notes that it may be relevant that neither Penn Commerce nor Condor are referenced in Glagola's Termination Agreement with TCW, despite the fact that the agreement does identify outstanding deals for which Glagola would receive commissions if they closed within three months of his termination. (Glagola's Mot. Summ. J. Ex. 9, ECF No. 68).

2) Plaintiff/Counter-Defendant Trainor's Motion for Summary Judgment (ECF No. 58) is DENIED;

3) Defendant/Cross-Defendant TDC and Third-Party Defendant TDC Logistics' Motion for Summary Judgment (ECF No. 59) is GRANTED;

4) Third-Party Defendant/Counterclaimant TCW's Motion for Summary Judgment (ECF No. 60) is DENIED;

5) Defendant/Counter-Plaintiff/Cross-Plaintiff/Third-Party          Plaintiff/Cross-Defendant Glagola's Cross-Motion for Summary Judgment (ECF No. 67) is DENIED;

6) The Clerk is directed to terminate TDC and TDC Logistics as parties from this case; and

7) The remaining parties shall confer and jointly file a status report within forty-five (45) days of this Order, to include whether they wish to participate in mediation with a US Magistrate Judge at this time.

SO ORDERED.


Date: <u>March 10, 2024</u>                                   /s/
                                          _____

                                          J. Mark Coulson
                                          United States Magistrate Judge