**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **GERALD TRAINOR,** | * |
| *Plaintiff/Cross-Plaintiff* | * |
| v. | * |
| **MARK GLAGOLA,** | * |
| *Defendant* | * Civil No. 1:23-cv-00881-JMC |
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
| *Cross-Defendant* | * |

\* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **MARK GLAGOLA,** | * |
| *Counter-Plaintiff* | * |
| v. | * |
| **GERALD TRAINOR,** | * |
| *Counter-Defendant* | * |
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
| *Counter-Co-Defendant* | * |

\* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
| *Counter-Plaintiff/Cross-Plaintiff* | * |
| v. | * |
| **GERALD TRAINOR,** | * |
| *Cross-Defendant* | * |
| **MARK GLAGOLA,** | * |

*Counter-Defendant*                                    *

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## MEMORANDUM OPINION AND ORDER OF JUDGMENT

Though somewhat confusing from a joinder standpoint,[1] this matter concerns the interpretation of two contracts and the parties' respective rights and responsibilities under both: Defendant Mark Glagola's May 14, 2018 Split Agreement with Plaintiff/Counter-Defendant Gerald Trainor (the "Split Agreement"), and Defendant's March 1, 2019 Qualified Real Estate Agent Agreement with Counter Co-Defendant Transwestern Carey Winston ("TCW") (the "QREA Agreement"). In summary, the question presented is whether, pursuant to those agreements, Defendant must share with Mr. Trainor and/or TCW the money he ultimately collected from third party Transwestern Development Company ("TDC") as a result of this Court's decision in his favor in *Glagola v. Transwestern Development Company*, 21-1230-JMC, 2022 WL 2916169 (D. Md. July 25, 2022), *aff'd.* 22-1890, 2023WL 4759124 (4th Cir. May 5, 2023). In that prior case, on July 25, 2022, this Court granted summary judgment in favor of current Defendant Glagola, finding that TDC owed Glagola more than $1.3 million, in addition to interest and a future payment based on a commercial real estate project not completed at that time. *Id.* at \*6-7. The Fourth Circuit affirmed this Court's opinion on July 26, 2023, and per a Notice of Satisfaction filed in that matter, TDC satisfied the judgment in full on August 16, 2023,

---

[1] For example. Defendant Glagola added Transwestern Carey Winston LLC ("TCW") as a defendant to Mr. Glagola's counterclaim against Mr. Trainor, which is permissible pursuant to Rule 13(a) and 13(h) of the Federal Rules of Civil Procedure, not Rule 14, which is limited to derivative claims. As such, vis a vis that claim, TCW is a counter-codefendant, not a third-party defendant as sometimes referred to by the parties. Similarly, when Plaintiff/Counter-Defendant Trainor brought his Rule 13(g) cross-claim against counter-co-defendant TCW, its "crossclaim" back against Mr. Trainor is technically a counterclaim even though also referred to as a crossclaim here.

paying Glagola a total of $1,837,821.73. (ECF No. 58). Trainor and TCW now seek those funds paid to Glagola.

As set forth more fully below, after conducting a bench trial on September 29-30, 2025, the Court finds that Defendant Glagola did not breach either agreement and may retain all of the money he previously collected from TDC.

    I.        **Applicable Law**

A court sitting in diversity applies the choice of law rules of the forum state, which, in this case, is Maryland. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). For breach of contract claims, Maryland applies 'lex loci contractus', utilizing the law of the state where the contract was formed unless the parties contractually agree to some other state's law. *State Auto. Mut. Ins. Co. v. Lennox*, 422 F. Supp. 3d 948, 961 (D. Md. 2019). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 790 A.2d 720, 728 (Md. Ct. Sp. App. 2002). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Cty. Comm'rs for Carrot Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Sp. App. 2008).

As will be shown below, Trainor and Glagola's Split Agreement was executed on May 14, 2018. At that time, they are both worked out of TCW's Maryland office and transacted business in Maryland. Glagola's QREA with TCW was also executed in Maryland. Given that the parties also agree that Maryland law applies in this matter, it appears that the contract was formed in Maryland. Accordingly, Maryland law on contracts applies in this case.

Interpretation of a contract is "ordinarily a question of law for the court." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 592 (D. Md. 2019). In interpreting a contract, "Maryland courts apply the objective theory of contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Id.* at 592 (citation omitted). In its analysis, a court "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated....[W]hen the language of the contract is plain and unambiguous[,] there is no room for construction, and a court must presume that the parties meant what they expressed." *United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824, 833 (D. Md. 2016) (*quoting Taylor v. NationsBank, N.A.*, 776 A.2d 645, 653 (Md. 2001)). A court will only consider extrinsic evidence concerning the parties' intent if it first deems the contract's language ambiguous." *Hartford*, 168 F. Supp. 3d at 833 (citing *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 277 n. 12 (Md. 2014)). Ultimately, if "there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances … the contract [is] submitted to the trier of fact for interpretation." *Id.* (quoting *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990)). The Court found such ambiguity in both agreements, denying summary judgment and leading to the September 29-30, 2025 bench trial. (ECF No. 77).

**II.    Findings of Fact**

The Court finds the facts listed below based on a preponderance of the evidence after considering the trial testimony and admitted exhibits, as well as the parties' proposed facts and conclusions of law. (ECF Nos. 102, 103 and 104).

1. Plaintiff and Defendant are both long-time commercial real estate professionals.

2. Plaintiff and Defendant both entered into independent contractor agreements[2] with Transwestern Carey Winston ("TCW"), an entity involved in sales, brokerage, consulting and investment activities for commercial real estate projects. (Jt. Ex. 33, Jt. Ex. 38, Jr. Ex. 40).

3. TCW performed different services for commercial real estate clients depending on the project. Typically, these services were spelled out in a Listing Agreement. They might include finding the land for a project, rendering consulting services, arranging for the sale or lease of the finished project, and, less commonly, finding equity investors for the project, among others. Plaintiff, Defendant, and others associated with TCW would then perform various aspects of those services on behalf of TCW. The fees/revenue TCW earned from those activities were collectively known within TCW as "commissions."

4. Among other things, the parties' respective agreements with TCW provided that the parties' main form of compensation from TCW would be based on a percentage of commissions generated by the parties for TCW from TCW's various real estate projects, split between the parties and TCW according to various formulas contained in their respective agreements.

5. The greater the fees to TCW that Plaintiff or Defendant generated by their activities on a TCW project, the greater the percentage of their respective commission split with TCW.

6. Eventually, Plaintiff and Defendant decided there was potentially greater synergy to combining their efforts on behalf of TCW, and asked TCW to combine their revenue from projects for purposes of calculating their commission split percentage with TCW. They

---

[2] Trainor's agreement with TCW was titled "Independent Contractor Agreement." For reasons unrelated to the issues in this litigation, Defendant's agreement was retitled a Qualified Real Estate Agent Agreement, which is the operative document. (Jt. Ex. 40).

formed a combined entity for these purposes known as Mid-Atlantic Capital Markets Group.

7. Now as part of that group, Plaintiff and Defendant entered into their own separate split arrangements with each other as to how their percentage of commissions received from TCW would be further divided between Plaintiff and Defendant. Plaintiff and Defendant began this in approximately 2016, but reduced it to writing on May 14, 2018, covering splits for 2018 and 2019 ("Split Agreement") which is the operative document (. (Jt. Ex. 3). TCW was aware of and signed off on the Split Agreement.

8. Plaintiff and Defendant disagree about the scope of the Split Agreement. According to Plaintiff, the Split Agreement was meant to cover any revenue the two brought in except investments, and it was not limited to distribution of commissions from TCW. According to Defendant, the Split Agreement only applied to distributions from TCW for the commissions TCW earned on a project as a result of Plaintiff's and Defendant's efforts. Even Plaintiff agrees however that, in fact, all splits they made between themselves during the parties' relationship were limited to distributions of commissions from TCW.

9. Typically, commissions were paid by TCW's client to TCW when the project "closed," although sometimes a project might have more than one "closing" or "commission event" throughout its life, depending on the services performed.

10. According to their respective agreements with TCW, any distribution from TCW to Plaintiff and Defendant would be calculated at the time TCW received its commissions from the project (typically at "closing"). Any further allocation as between Plaintiff and Defendant pursuant to their splitting arrangement would be governed by the particular split arrangement then in effect at the time that TCW made its distribution.

11. Aside from distributions from TCW based on their fee generating activities for a project, Plaintiff and Defendant were periodically given individual opportunities to participate in the "promote" for a project whereby they were assigned a percentage ownership in the so-called "promotion interest" of the project by the project's developer. (See, e.g., Jt. Ex. 25, offering Plaintiff the opportunity to participate in the promote for a project known as "Springfield" in 2017).

12. A "promote" typically was a provision in the agreement between the project owners and the project developer whereby the developer would be entitled to additional revenue upon the occurrence of certain events based on certain criteria set forth in the provision. For example, a promote might be based on when the project was sold to a third party or when the project was leased to near capacity (called "stabilization"). The developer, in turn, would provide a percentage of that compensation to those who had been granted the ability to participate in the promote.

13. In the commercial real estate industry, which is highly competitive, offering participation in promotes was done for retention of top producers and, at times, as personal recognition for playing a key role in the success of the project or for introducing or broadening productive relationships with others such as investors. A participant need not necessarily have done any work on a project in order to participate in that project's promote.

14. Because the promote was payable to the developer, any assignment would be governed by an agreement reached between the developer and the participant.

15. In many cases, in order to take advantage of the opportunity to participate in the promote, a participant would be called upon to invest their own funds to receive their assigned percentage because the developer had originally invested some percentage of the overall

    equity in the project. However, both Defendant and John Thomas, former Managing Partner of TDC, testified that there are situations in the industry where a participant would be assigned a percentage of the promote without being called upon to invest personal funds.

16. Up until the current dispute, Plaintiff and Defendant had each been offered the ability to participate in the promote for various projects. Those previous promotes were of a type that required Plaintiff and Defendant to invest their own funds in return for a specified percentage of the promote.

17. Plaintiff and Defendant agreed that participating in promotes was outside the scope of their split arrangement, that they were free to negotiate these for themselves directly with the developer, that the terms of, and their participation in, any promote were private agreements between themselves and the developer, and that they typically did not discuss the details of these agreements with each other.

18. In June of 2016, TCW (and the parties) became involved in a project known as Penn Commerce, a warehouse project in central Pennsylvania. (Jt. Ex. 17). The project developer, Transwestern Development Company ("TDC")[3] was looking for equity investment in the project and asked TCW to provide assistance in locating investors. TDC was in the same "family" of companies as TCW, but was a separate company from TCW. Both TDC and TCW were under the umbrella organization of Transwestern Commercial Service ("TCS").

19. TCW was not typically involved in finding equity investors for projects, but TCW nonetheless agreed to assist TDC in looking for equity investors for a flat fee commission

---

[3] The parties agree that "Ridge Development" should be treated as TDC.

of $250,000, although apparently TCW neglected to memorialize this in a formal listing agreement as would typically have been the practice. There is, however, both an email outlining what services would be provided (Jt. Ex. 7), as well as a final invoice for this service from TCW to TDC (Jt. Ex. 65).

20. Plaintiff and Defendant worked together to assemble a list of prospective equity investors for Penn Commerce, including a prospect described as "Principal/CalStrs." (Jt. Ex. 7). Principal was an insurer and investment fund manager that provided funding on some previous TCW/TDC projects either using its own funds or on behalf of some of its clients for whom it was managing funds. In this case, Principal was managing funds for investment on behalf of the California State Teachers Retirement System ("CalStrs").

21. Plaintiff and Defendant decided that as to Principal/CalStrs, Defendant would take the lead role in trying to secure equity investment for TDC's Penn Commerce project.

22. Eventually, Principal/CalStrs did provide 100% of the equity funding for the Penn Commerce project, and the project closed in August of 2018. (Jt. Ex. 8). TDC paid TCW its $250,000 commission, a portion of which was distributed to Plaintiff and Defendant based on their respective TCW distribution percentages (Jt. Ex. 64), which was then split between Plaintiff and Defendant pursuant to their May 14, 2018 Split Agreement.

23. Like many projects, the Penn Commerce project had a promote that provided certain additional "incentive fee" payment to the developer (TDC) if/when certain benchmarks were met, including primarily leasing substantially all of the space (i.e. "stabilization"). (Jt. Ex. 43, ¶ 6.2). However, because Principal/CalStrs provided 100% of the equity for the project, TDC could not offer its typical investment opportunity to participants who might otherwise share in a percentage of the promote based on TDC's own equity

investment in the project. Notwithstanding that, TDC's President, Carleton Riser, told Defendant in an email dated August 2, 2018 that "I am going to dial you in for a piece of the promote on Penn Comm" based on Defendant's efforts in securing Principal/CalStrs as an investor. (Jt. Ex. 44). That is, the Penn Commerce promote was of the type that did not require participants to invest their own funds.

24. For approximately nine months after the August, 2018 Penn Commerce Closing, Defendant pursued TDC for participation in TDC's promote as previously offered by TDC's President. (See, e.g., Jt. Ex. 50 and Jt. Ex.9). TDC discussed the extent of Defendant's participation internally during that time, including at one point observing "if this were a straight up equity deal he'd likely have gotten a 4% allocation…. " (Jt. Ex. 52).

25. Plaintiff denies knowing that Defendant was pursuing participation in the Penn Commerce promote on his own behalf; he contends he and Defendant only talked about efforts to obtain more money from TDC, which Plaintiff assumed was on their mutual behalf pursuant to their Split Agreement. Plaintiff asserts he knew nothing about Defendant's efforts towards securing a piece of the Penn Commerce promote for himself until after Defendant's lawsuit was filed against TDC in 2023.

26. Defendant contends he verbally told Plaintiff that he was pursuing participation in the Penn Commerce promote on several occasions to the point where Plaintiff actually discouraged him from continuing those efforts so as not to undermine Defendant's status with TCW and TDC. Additionally, Plaintiff was copied on an email thread dated August 16, 2018 which included TDC's offer to "dial Defendant in" to the promote. (Jt. Ex. 62).

27. Defendant outlined his final proposal for participation on May 28, 2019 in an email to Carleton Riser, TDC's President (who had made the original offer to "dial in" Plaintiff to the Penn Commerce promote) and John Thomas, TDC's then Managing Partner. (Jt. Ex. 15).  Defendant forwarded that proposal to TCW that same date. TCW did not object nor did TCW  bring up Plaintiff's and Defendant's Split Agreement, of which it was aware. Defendant's proposal also included participating in the promote for another project in California, Condor, for which CalStrs was also providing equity investment, referred to in the proposal as the "CA deal."

28. TDC's Riser and Thomas discussed Defendant's proposal that same date, indicating Defendant's proposal as to Penn Commerce was "in line with what he'd have been allocated as equity…."  (Jt. Ex. 47).

29. In TDC's response to Defendant, TDC agreed to allow Defendant to participate in the Penn Commerce (and Condor) promote on May 29, 2019, copying TCW on that same date.  (Jt. Ex. 13 and 16).

30. Meanwhile, Plaintiff and Defendant ended their Split Agreement and their business relationship on June 30, 2020.  They agreed to a split of any deals in the pipeline at that time that might come to completion after June 30, 2020.  Although that termination agreement was not reduced to writing, the parties agree that the terms of it (including the specific deals in the pipeline) are reflected in the September 18, 2020 written termination agreement between TCW and Defendant.  (Jt. Ex. 5). All of the "pipeline" deals listed were TCW projects.   Neither Penn Commerce nor Condor were included on that list.  Plaintiff reviewed this list and signed off on it.

31. Ultimately, by the time the criteria for payment of the promote to TDC (and, in turn, Defendant) were met in 2021 and 2022, Defendant had left TCW. TDC used that departure as a reason not to pay Defendant. In separate litigation in this Court, the undersigned granted summary judgment in favor of Defendant, and TDC paid Defendant as previously agreed after that decision was affirmed by the Fourth Circuit.

32. The current litigation, filed March 31, 2023, concerns whether Defendant's participation in the Penn Commerce and Condor promotes comes within Defendant's QREA Agreement with TCW and/or his May 14, 2018 Split Agreement with Plaintiff such that Defendant is obligated to share that money with TCW and/or Trainor, in whole or in part.

### III. Conclusions of Law

1. Defendant's participation in the Penn Commerce and Condor promotes are specifically excepted from his QREA Agreement such that he owes no money to TCW. (Jt. Ex. 40).

Section 2(d) by its very terms does not apply to Defendant's "participation in or ownership of other businesses, ventures, enterprises or other investments, so long as such activities do not materials and adversely inhibit [Defendant's] ability to perform [Defendant's] obligations and responsibilities hereunder" as long as such "activities and ownership interests" are disclosed to TCW in writing. *Id*. at 3.

First, there was no evidence or testimony at trial that any activities by Defendant adversely inhibited Defendant's ability to perform his obligations and responsibilities to TCW. Second, TCW cannot dispute that it had notice of the promote. TCW was copied on the final agreement between TDC and Defendant as to his participation in the promote in May of 2019, and did not object nor did it bring up Plaintiff's and Defendant's Split Agreement, of which it

was also aware. TCW's representative testified that if TCW had an objection, it would have asserted it. TCW also did not include Penn Commerce or Condor on the list of "pipeline" deals in its September 18, 2020 termination agreement with Defendant.

The issue then becomes whether participation in the Penn Commerce/Condor promote otherwise falls within the exclusion language of Section 2(d) of the QREA Agreement. The Court finds that it does. All witnesses confirmed that participation in promotes were never regarded as commissions and were outside the QREA Agreement. TCW also did not include Defendant's participation in the "pipeline" of projects listed in Defendant's termination agreement despite knowing about it.

To be sure, TCW contests that Defendant's deal with TDC was, in fact, a promote, but the evidence strongly points the other way. TDC and Defendant certainly referred to it as a promote. Nothing about the promote at issue suggested that it was a "commission" as that term was used by all of the witnesses; a separate commission was already paid to TCW (and split by Plaintiff and Defendant) for TCW's work on this project. While it is true that the promote at issue did not provide an investment component as was typically the case with previous promotes in which Plaintiff and Defendant participated, this was based on the structure of the investment (with Principal/Calstrs providing 100% of the investment). Defendant testified based on his long experience in the industry that not all promote participation requires out-of-pocket investment by the participant. John Thompson, then Managing Partner of TDC also testified that some promotes allowed for participation without investment. TDC also made clear that the terms of this promote were meant to "mimic" the more typical investment opportunity offered in a promote, such as that offered on the Springfield project. TCW's current position on the promote only came after Defendant was successful in his litigation with TDC.

2. Payment of the Penn Commerce promote did not constitute a second "closing" so as to take it beyond the applicable time period of the parties' May 14, 2018 Split Agreement.

Plaintiff testified as such, and Defendant's testimony did not meaningfully contradict him on this point. As discussed immediately below however, such activity being within the *time period* of the Split Agreement does not mean that they are of the type that are subject to the substantive terms of that agreement.

3. Plaintiff does not have a valid claim for the payments received by Defendant from TDC because such payments are of a type that are outside the scope of the parties' May 14, 2018 Split Agreement.

All splits between Plaintiff and Defendant during their affiliation were based on commissions paid to them by TCW. That is, they all had as their genesis fees generated by Plaintiff and Defendant for TCW on TCW projects. While the types of commission activities carried different names, including sourcing fees, finder's fees, success bonuses, brokerage fees, etc., it is not the name given to the activity that was important; it was whether or not the activity by Plaintiff and Defendant in the first instance generated a commission to TCW based on TCW's agreement with its customer. By contrast, the parties agree that participation in a project developer's promote by either of them was not part of their split arrangement but was a private, separate agreement pursued by them individually where not even the specific details—let alone the revenue—were shared between them. It is also significant that all the "pipeline" deals discussed by the parties in their termination of June 30, 2020 were TCW deals and did not include Penn Commerce/Condor.

The Springfield project is a classic illustration of the parties' course of dealing on commissions versus promotes—with Plaintiff and Defendant splitting commissions based on five separate "commission events" set forth in TCW's listing agreement with its customer, but pursuing their own participation percentages in the promote.  So too is Penn Commerce/Condor.  It generated both a commission to TCW (based on procuring the investor) which was split by Plaintiff and Defendant pursuant to their Split Agreement, and also a separate promote that did not generate fees to TCW but where Plaintiff and Defendant were free to each seek (and fully retain) a participation percentage.  That Defendant was successful in obtaining his (with Plaintiff apparently not pursuing his own) does not bring it within the scope of the parties' Split Agreement any more than Plaintiff's greater participation in the Springfield promote.

As discussed above with regard to TCW, it is true that up to the point of the Penn Commerce project, all promotes in which Plaintiff or Defendant participated carried an investment component.  But, as with the use by the parties of the term "commissions," labels are not determinative.  The operative question is not whether Defendant's Penn Commerce participation was an "investment," but whether it was a promote.  Given that the developer's president, TDC's Mr. Riser, referred to it as a promote and confirmed that it was designed to mimic previous investment-based promotes for past projects, the Court is persuaded that it indeed was.  Penn Commerce/Condor was an unusual project where the outside investor, Principal/Calstrs, put up 100% of the equity, eliminating the ability to have a more traditional promote.  But, as Mr. Riser confirmed, the concept was the same in allowing participation in the inventive fees called for once the project was stabilized.

Plaintiff testified that he was unaware Defendant was pursuing a promote specifically, but knew that he was seeking more money from Penn Commerce that Plaintiff presumed was for

both of them. There is no contemporaneous writing confirming that understanding. And Plaintiff did not include Penn Commerce (or Condor) in the "pipeline" of ongoing projects agreed to by the parties at the time their agreement ended, as documented in Defendant's September 18, 2020 separation agreement with TCW (which Plaintiff signed off on). Additionally, Plaintiff was copied on an email thread describing Defendant's efforts in pursuing the promote and, according to Defendant, even cautioned Defendant against being too aggressive those efforts. As importantly, even if, despite the evidence to the contrary cited above, Defendant's efforts were completely clandestine, that would not be inconsistent with the parties' prior course of dealing when negotiating their own promote participation notwithstanding their Split Agreement.

### IV.  Conclusion

The Court finds therefore that in retaining the money he recovered from TDC, Defendant did not breach his Split Agreement with Plaintiff nor his QREA with TCW. Accordingly, judgment is entered in favor of Defendant.

November 25, 2025
Date

Hon. J. Mark Coulson
U.S. Magistrate Judge
U.S. District Court for the
District of Maryland