**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **GERALD TRAINOR,** | * |
|     *Plaintiff/Cross-Plaintiff* | * |
| v. | * |
| **MARK GLAGOLA,** | * |
|     *Defendant* | *    Civil No. 1:23-cv-00881-JMC |
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
|     *Cross-Defendant* | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

| | |
|---|---|
| **MARK GLAGOLA,** | * |
|     *Counter-Plaintiff* | * |
| v. | * |
| **GERALD TRAINOR,** | * |
|     *Counter-Defendant* | * |
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
|     *Counter-Co-Defendant* | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

| | |
|---|---|
| **TRANSWESTERN CAREY WINSTON, LLC,** | * |
|     *Counter-Plaintiff/Cross-Plaintiff* | * |
| v. | * |
| **GERALD TRAINOR,** | * |
|     *Cross-Defendant* | * |
| **MARK GLAGOLA,** | * |

1

*Counter-Defendant*                            \*

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

# MEMORANDUM OPINION AND ORDER
# DENYING MOTION TO ALTER OR AMEND JUDGMENT

Plaintiff, Gerald Trainor, filed a timely Motion to Alter or Amend Judgment on December 23, 2025. (ECF No. 110). Defendant, Mark Glagola, filed an Opposition. (ECF No. 117). Plaintiff subsequently file a Reply. (ECF No. 123). As set forth more fully below, Plaintiff's Motion (ECF No. 110) is DENIED.

## I.   INTRODUCTION

Plaintiff Trainor and Defendant Glagola are both long-time commercial real estate professionals who both worked on projects on behalf of Transwestern Carey Winston, LLC ("TCW"), an affiliate of Transwestern Commercial Services ("TCS"). This matter concerns the interpretation of two agreements: the 2018 Split Agreement between Plaintiff and Defendant, and the QREA independent contractor agreement between Defendant and TCW. Specifically, the issue is whether and to what extent either agreement is applicable to a real estate project known at "Penn Commerce/Condor" and Defendant's participation in an incentive fee that that project's developer, Transwestern Development Company ("TDC") received and partially redistributed once the project reached a post-closing benchmark. After a bench trial, the Court issued findings of fact and conclusions of law that Defendant's participation did not come within the scope of either agreement, entitling him to keep those proceeds. (ECF No. 105).

## II.   LEGAL STANDARD

Federal Rules of Civil Procedure 52(b) and 59(e) provide the procedural mechanism for a court to alter or amend a prior judgment. Fed. R. Civ. P. 52(b) and 59(e). As recently reiterated by the Fourth Circuit in *Chavez-Deremer v. Medical Staffing of America*, LLC, Rule 52(b) is meant to "correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence." 147 F.4th 371, 414 (4th Cir. 2025) (quoting *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986)). "Nor does it allow a party "to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Id.* (citing *Fontenot*, 791 F.2d at 1219). Similarly, there are three recognized circumstances in which the district court can grant a Rule 59(e) motion: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir.1998). "[M]ere disagreement does not support a Rule 59(e) motion." *Hutchinson v. Staton,* 994 F.2d 1076, 1082 (4th Cir.1993).

Although Plaintiff eloquently sets forth his disagreements with this Court's findings of fact and conclusions of law, those disagreements largely amount to his reassertion of his trial arguments or proposed findings of fact and conclusions of law already rejected by this Court, sometimes with a slightly new twist. The Court therefore concludes that the rigors of the rules are not met, and no alteration or amendment is appropriate.

### III.   ANALYSIS

The Court first observes that Defendant's Opposition provides a detailed and persuasive rebuttal to Plaintiff's arguments. Additionally, the Court provides further clarity to its denial of Plaintiff's motion immediately below.

#### A.   Plaintiff's Proposed Revisions/Additions to This Court's Findings of Fact

Plaintiff proposes revisions to this Court's findings of fact at paragraphs 11, 15, 16 and 23. (ECF No. 110-1 at 3-10). These revisions reiterate Plaintiff's position that any participation in a project's "promote" required an out-of-pocket investment of funds from the participant. *See id.* While, as the Court acknowledged, this was often true, the testimony suggested it was not always true and not true in the instant case. (ECF No. 105 at 8). For example, Mr. Thompson testified that some non-investors could participate by entering into a "shared appreciation right" ("SAR") agreement. (Thompson Testimony, ECF No. 101 at 17-18). Defendant Glagola testified that there were other arrangements participants could reach that also did not involve investment of personal funds. *See* (Glagola Testimony, ECF No. 101 at 88-89). It was undisputed at trial that the Penn Commerce/Condor project was unusual in that the customer put up all the equity such that the developer could not offer the typical investment opportunity to participants that it otherwise would have. In the absence of that, and wanting to "mimic" such an opportunity, the developer instead entered into a "one off" agreement with Defendant that did not require an out-of-pocket investment on his part. Given the similarity of that one off agreement to previous opportunities to participate offered on other projects, the Court deemed this Defendant's agreement with the TDC a "promote."

The Court also disagrees that this is inconsistent with its ruling in the previous related case of *Glagola v. Transwestern Development Company, et al.*, where it first recognized the unique "no equity" arrangement in the Penn Commerce/Condor project. 21-1230-JMC, 2022 WL 2916169, at *6-*7 (D. Md. July 25, 2022), *aff'd.* 22-1890, 2023 WL 4759124 (4th Cir. May 5, 2023). There, TDC sought to impose a "continued employment" term on Defendant's ability to participate in the promote, arguing that his separation from TCW negated such participation. *Id*. at *4-*5. TDC's argument relied on continuous employment language borrowed from a different kind of promote participation, the SAR described above. *Id*. This Court ruled, however, that Mr. Glagola had not

4

entered into an SAR agreement, and that his participation was instead a "one-off" given its atypical nature with the customer footing 100% of the equity for the project and was therefore instead governed by the specific terms negotiated between Mr. Glagola and TDC. *Id*. Accordingly, this Court rejected TDC's attempt to shoe-horn promote participations into either investing a participant's own funds or entering into an SAR agreement. *Id*.[1] The Court similarly rejects Plaintiff's resurrection of that binary here.

Plaintiff next invites the Court to add an additional finding of fact that "(i)n 2018, Trainor agreed that Glagola could pursue additional compensation for the partners' services; he did not agree that Glagola could obtain and retain such compensation personally outside the split." (ECF 110-1 at 11). The Court declines to do so. First, notwithstanding Plaintiff's testimony of the broad nature of the 2018 Split Agreement, Defendant disputed that testimony and characterization, arguing that the 2018 Split Agreement applied only to commissions. (ECF No. 105 at 6; ECF No. 101 at 40-41 and 46-47). Second, the 2018 Split Agreement did not mention splitting "compensation" but "commissions," a reading confirmed by Plaintiff in his February 21, 2020 email extending the 2018 Split Agreement into the first half of 2020, stating in pertinent part, "[W]e will continue to split commissions 60/40." Jt. Ex. 3. Third, as the Court found at trial, all splits that had occurred and that were to occur under that 2018 Split Agreement were of commissions first paid to TCW and then re-distributed to Plaintiff and Defendant. (ECF No. 105 at 6). Indeed, the $250,000 commission portion of the Penn Commerce/Condor project was split in exactly that way. *Id*. at 9. By contrast, both Plaintiff and Defendant were clear in their testimony that opportunities to participate in a project's promote were personal matters that were outside the

---

[1] In so doing, the Court found no ambiguity in the agreement between TDC and Glagola and, accordingly, rejected TDC's efforts to imply a "continuous employment" term by relying on the SAR and the parties' course of dealing. *Id*. at *5.

5

scope of their agreement and, indeed, were not usually discussed with each other in any detail. (ECF No. 105 at 8; ECF-100 at 80-84; 90-91 and 96; ECF 101 at 48-49). While it is true that such participation had been, to that point, by way of investment of personal funds, as explained above, that is not the sole path to participation in a promote.

Plaintiff next proposes an amended finding of fact that the omission of the Penn Commerce/Condor project from Defendant's Termination Agreement with TCW (adopted by Plaintiff) is irrelevant. The Court disagrees. As noted above, it is Plaintiff's position that the Penn Commerce/Condor payment to Defendant was compensation subject to the parties' 2018 Split Agreement. (ECF No. 110-1 at 10). While the Court disagrees with this position for the reasons described previously, all other such compensation that was still in the "pipeline" and subject to the parties' split arrangement at the time of the Defendant's separation is specifically listed on the TCW Termination Agreement, yet Penn Commerce/Condor is absent. Plaintiff posits that that was because he didn't know about Defendant's Penn Commerce/Condor agreement. But Plaintiff testified that he was at least generally aware of Defendant's efforts to try to obtain money from Penn Commerce/Condor though denies knowing these efforts by Defendant were just on his own behalf. (ECF No. 100 at 49). This is somewhat contradicted by the fact that he was copied on an email thread indicating that TDC intended to "dial in" Defendant to the promote (without mentioning Plaintiff),[2] and that, according to Defendant, Plaintiff even attempted to temper Mr. Glagola's efforts in that regard. (Jt. Ex. 62; ECF No. 101 at 75-76). TCW also had notice of Defendant's participation yet did not object despite its knowledge of the 2018 Split Agreement

---

[2] Plaintiff presented some testimony at trial from himself and others that suggested TDC may not have known of the 2018 Split Agreement at the time it offered to "dial [Defendant] in for a piece of the promote," but even if that was the situation as to TDC, Plaintiff certainly knew of the 2018 Split Agreement yet raised no issue as to why only Defendant was referenced in the email. There was also an alternative suggestion that TDC's use of the word "you" in the email describing the promote led to a reasonable assumption that TDC was referring to both Plaintiff and Defendant. That, however, would not then explain why Penn Commerce/Condor was not included in the "pipeline" of projects listed in Defendant's termination agreement.

(which it had been otherwise honoring with respect to commissions) and did not include it in the "pipeline" of projects listed in Defendant's termination agreement. Thus, it is not unreasonable to conclude that it would at the very least have been addressed as an open issue if Plaintiff (or TCW) regarded it as "partnership compensation" that should be split at the time of the Termination Agreement (drafted by TCW and approved by Plaintiff). To be sure, it is not the only evidence causing the Court to conclude that the promote was outside the 2018 Split Agreement, but it is not irrelevant as Plaintiff urges.

### B.  Plaintiff's Complaints with This Court's Conclusions of Law

Plaintiff takes issue with both the facts relied on for some of the Court's conclusions of law, as well as this Court's application of Maryland Contract Law.

First, the Plaintiff's proposal to amend the Court's statement within Conclusion of Law 1 to "[a]ll witnesses confirmed that participation in promotes were never regarded as commissions and were outside the QREA Agreement" is rejected. (ECF No. 110-1 at 13; ECF No. 105 at 13). Plaintiff again relies on his unsuccessful argument that only participation through a direct investment of funds by the participant (or sometimes SARs) renders any redistribution from a developer a "promote" outside the scope of Defendant's QREA with TCW and the parties' 2018 Split Agreement. As set out above, the Court rejects this framing, finding that "promotes" are not as narrow as Plaintiff urges, particularly when they are "one off" agreements meant to deal with the unusual lack of developer equity situation presented by Penn Commerce/Condor. While some witnesses disputed the Court's wider definition of promote, all were consistent that promotes (at least as narrowly defined by them) were considered outside the scope of those agreements.

In the same way, the Court distinguishes "promotes" from "commissions," a distinction Plaintiff does not accept. (ECF No. 110-1 at 9). Plaintiff attempts to re-argue why the money

7

shared with the Defendant by TDC was more like a commission than a promote due to its lack of direct investment of funds from Defendant, an argument that Plaintiff certainly articulated in his testimony. (ECF No. 110-1 at 14-15). But the Court explicitly disagreed, relying on other evidence including that the payor, TDC, referred to it as a promote intended to "mimic" the investment opportunity that even Plaintiff would agree would have been outside both the QREA Agreement and the 2018 Split Agreement had a more traditional investment opportunity been available. (ECF No. 101 at 25-26). Additionally, as explained above, all commissions previously split by the parties (including the $250,000 commission component of the deal already paid by Penn Commerce/Condor to TCW and then split by the Plaintiff and Defendant) were first received by TCW and then split by the parties. Commissions, according to Plaintiff's own testimony, refers to revenue earned by TCW and then distributed to Plaintiff and Defendant. (ECF No. 100 at 118-119). By contrast, both Plaintiff and TCW's witness, Mr. Foery, explained that no additional services needed to be performed by TCW or Defendant in order for Defendant to share in the Penn Commerce/Condor promote. (ECF 100 at p. 73; Id. at 179).

      Plaintiff also challenges this Court's conclusions of law as being inconsistent with Maryland contract law, arguing that the Court impermissibly "reads out" of Section 2(d) QREA the word "investment," in its conclusion that TDC's sharing with Defendant through their one-off agreement was outside the scope of the TCW's QREA and Plaintiff and Defendant's 2018 Split Agreement without first finding ambiguity in the agreements. (ECF No. 110-1 at 15-17; ECF 123 at 2-6.) As an initial matter, the Court has already ruled that the operation of the QREA (including Section 2(d)) in the context of the Penn Commerce/Condor project could not be resolved as a matter of law on its face when it denied cross-motions for summary judgment on this and other issues. (ECF No. 77 at 31-34). As the Court then explained, "[b]ecause there is legitimate doubt

8

as to whether [the CalSTRS/Condor promote] should be characterized as revenue of TCW or as participation in a separate venture, summary judgment should be denied." *Id*. at 34 (*citing Rock Spring Plaza II, Inc. v. Invs. Warranty of Am.*, 618 F. Supp. 3d 262, 267 (D. Md. 2022) (If "there is a bona fide ambiguity in the contract's language *or legitimate doubt as to its application under the circumstances*…the contract [is] submitted to the trier of fact for interpretation")) (emphasis added).

But even limiting itself to the language of the agreement, Plaintiff's reading does not consider the full context of Section 2(d):

> Nothing contained in this Agreement shall be deemed to prohibit or preclude the AGENT's *participation* in or ownership of other businesses, ventures, enterprises *or* other investments so long as such activities do not materially and adversely inhibit the AGENT's ability to perform the AGENT's obligation and responsibilities hereunder. All such activities and ownership interests shall be disclosed to the Company in writing.[3]

Jt. Ex 40 (emphasis added). A fair reading of this language excludes not only "investments" from the QREA but any type of participation in or ownership of an interest, whether or not requiring the out-of-pocket investment of capital by the participant. But even the word "investment" in its ordinary meaning does not always require the contribution of one's own capital. Employees, trust or estate beneficiaries, and gifted investments are all examples of situations where no out-of-pocket funds are necessarily required by the holder. And, as applicable to this project, Plaintiff's participation was intended to mimic the investment opportunity that would ordinarily be available had the customer not put up all of the project's equity without further out of pocket cost.

---

[3] The parties do not dispute that TCW was given notice of Defendant's participation and did not object, despite TCW's knowledge of the 2018 Split Agreement.

9

Plaintiff also argues in his Reply that the Court's conclusions of law erred in considering extrinsic evidence regarding the word "commission" in the parties' 2018 Split Agreement without first concluding that it was ambiguous. (ECF No. 123 at 6-9). Plaintiff argues that the Court was required to determine from the contract language alone "what would a reasonable person in the parties' position have believed the Split Agreement required them to split," and then "what would a reasonable person in the position of the parties have understood 'commissions' to mean?" *Id*. at 9. This is somewhat at odds with Plaintiff's trial testimony that commissions is a "loose word." (ECF No. 100 at 118). Additionally, contrary to Plaintiff's argument now, the Court has already addressed both issues. In its Memorandum and Opinion addressing the parties' motions for summary judgment, the Court noted foundational issues with regard to the 2018 Split Agreement, including "what constitutes a commission." ECF 77 at 8. The Court then specifically found the Split Agreement to be ambiguous. *Id.* at 29 ("the Court first concludes that the 2018/2019 Split Agreement is ambiguous."). That finding was based on precisely what the Plaintiff urges in that the Court found that the 2018 Split Agreement "contains minimal details and does not define what precisely the parties agreed to split…." *Id*. As a result of finding that ambiguity, the Court further noted that the extrinsic evidence on that issue was in conflict given the parties' respective positions on the meaning of "commission." *Id*. Based on the evidence and testimony adduced at trial, the Court then concluded that "commissions" as used in the 2018 Split Agreement did not include the Penn Commerce/Condor promote.

Accordingly, the Court disputes that its conclusions are inconsistent with Maryland contract law.

## IV.  CONCLUSION

For the reasons stated above, Plaintiff Trainor's Motion to Alter or Amend (ECF No. 110). is DENIED.

Dated: February 20, 2026                                          /s/
                                                                          J. Mark Coulson
                                                                          United States Magistrate Judge